**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| THE SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS, 523 Ashmun Street Sault Ste. Marie, MI 49783 | ) ) ) ) ) | |
| *Plaintiff*, | ) ) ) | Civil Action No. ___18-cv-2035___ |
| v. | ) ) | |
| RYAN ZINKE, Secretary, United States Department of the Interior; | ) ) ) | |
| and | ) ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street NW Washington, D.C. 20240 | ) ) ) ) ) | |
| *Defendants*. | ) ) | |

**COMPLAINT**

The Sault Ste. Marie Tribe of Chippewa Indians ("Sault Tribe," "Tribe," or "Plaintiff"), a

federally recognized Indian tribe, hereby alleges:

**INTRODUCTION AND NATURE OF ACTION**

1.      The Sault Tribe brings this action under the Administrative Procedure Act ("APA")

and the federal mandamus statute against Defendants, the Secretary of the Interior (the

"Secretary") and the United States Department of the Interior (the "Department"), challenging the

Department's unlawful refusal to take certain parcels of land into trust for the Tribe under the

Michigan Indian Lands Claims Settlement Act ("MILCSA" or "the Act"), Pub. L. 105-143, 111

Stat. 2652 (1997), as well as its inexplicable failure, for more than three years, to resolve a

ministerial precondition to trust status.  Defendants' arbitrary and unlawful decisions and

unexplained delays have seriously undermined the economic well-being of the Sault Tribe, and

threaten to defeat Congress's purposes in enacting MILCSA to settle land claims against the

United States and to promote tribal economic development.

2.      The history of the Sault Tribe—the largest tribe by membership in Michigan—is

marked by a multi-generational effort to rebuild a sustainable land base after the United States'

unconscionable actions in the nineteenth century resulted in the loss of all the Tribe's lands.

In 1997, Congress enacted MILCSA to distribute outstanding judgments resulting from the United

States' unlawful conduct.  MILCSA established a "Self-Sufficiency Fund" to receive the Sault

Tribe's distributions, but left it to the Board of the Tribe to determine how to use those

distributions to achieve tribal economic development and self-sufficiency.  As relevant here,

MILCSA provides that the Tribe may use interest or other income from the Self-Sufficiency Fund

to purchase land when it concludes that doing so would consolidate or enhance tribal lands or

advance the tribe's social welfare.  MILCSA also provides that, when the Tribe purchases land

with interest or other income from the Self-Sufficiency Fund, the Secretary must hold those lands

in trust for the Tribe's benefit.  The statutory text on these points is unambiguous.

3.      In 2012, facing a dire financial situation, the Tribe's governing body, its Board of

Directors, ratified a comprehensive plan to benefit tribal members.  To provide essential

government revenue, the plan contemplated that the Tribe would open new gaming facilities in

Michigan's Lower Peninsula, consistent with the Indian Gaming Regulatory Act ("IGRA").  After

determining that MILCSA's requirements were satisfied, the Tribe's Board authorized the

purchase of parcels of land in the Lower Peninsula using interest income from the Self-Sufficiency

Fund.  Then, in 2014, the Tribe filed two fee-to-trust submissions with the Department of the

Interior, seeking to have the Department take those parcels into trust—thereby paving the way for potential gaming and other economic development on the land and helping the Tribe to meet the pressing needs of thousands of tribal members living in the Lower Peninsula.

4.      After a delay of more than three years, in July 2017, the Department denied the Tribe's request that the Department fulfill its mandatory duty to take the parcels into trust.  The Department's denial decision, which rested on its determination that the Tribe's Board erred in concluding that the land purchases would consolidate or enhance tribal lands or advance the tribe's welfare, arrogates to the Department a power that MILCSA does not give it and is therefore contrary to law.  Moreover, even if the Department could lawfully exercise the power to determine the propriety of the Tribe's land purchases, its denial decision misreads MILCSA's plain language. Further, the Department's denial countermands the APA's core requirement of reasoned decisionmaking by wholly ignoring relevant evidence the Tribe had submitted demonstrating that the land acquisitions at issue were essential to addressing the Tribe's need for land and economic development to promote the well-being of the Tribe's members.  Finally, the Department unreasonably failed to address or resolve a ministerial issue as to which the relevant facts are plain on the record—creating the risk that if the Tribe prevails in its challenge to the Department's decision, it could face even more years of delay waiting for the agency to honor its mandatory responsibility to take the Tribe's land into trust under MILCSA.

5.      This Court should remedy both the Department's unlawful decision denying the Tribe's trust submissions and its unreasonable delay.  The Sault Tribe respectfully asks this Court to declare the Defendants' conduct unlawful; to vacate the final decision denying the Tribe's trust submissions under MILCSA; to order Defendants to take the parcels into trust (or in the alternative, to order Defendants to resolve any remaining ministerial issues in the Tribe's favor);

and to provide other relief needed to remedy Defendants' unlawful conduct and to vindicate the congressional purposes underlying MILCSA.

## JURISDICTION AND VENUE

6.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§1331 (federal question), 1361 (mandamus), and 1362 (actions brought by Indian tribes arising under federal law).  The Tribe seeks vacatur as well as injunctive and declaratory relief pursuant to the APA, 5 U.S.C. §§701-706, and the Declaratory Judgment Act, 28 U.S.C. §§2201-2202.

7.      Venue is proper in this Court under 28 U.S.C. §1391(e) because Defendants reside in this District and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

8.      Plaintiff Sault Tribe has been a federally recognized Indian tribe since 1972.  Its formal name is "Sault Ste. Marie Tribe of Chippewa Indians, Michigan."  81 Fed. Reg. 26,826 (May 4, 2016).  Its headquarters are located at 523 Ashmun Street, Sault Ste. Marie, MI 49783.

9.      Defendant Ryan Zinke is the Secretary of the United States Department of the Interior, an agency of the United States Government, located at 1849 C Street NW, Washington, D.C. 20240.  Defendant Zinke is sued in his official capacity as Secretary of the Interior.

10.     Defendant United States Department of the Interior is an agency of the United States Government, located at 1849 C Street NW, Washington, D.C. 20240.

## FACTUAL ALLEGATIONS

### I.      THE SAULT TRIBE

11.     The Sault Tribe "'is the modern day political organization of the Chippewa bands which inhabited the eastern portion of the Upper Peninsula of Michigan since before the coming of Europeans.'"  *Sault Ste. Marie Tribe of Chippewa Indians v. United States*, 576 F. Supp. 2d 838,

840 (W.D. Mich. 2008). The Tribe is the "'successor to distinct historic bands of Ojibwe peoples, who occupied five disparate geographic locations in the Upper Peninsula of Michigan.'" *Id.* at 841.

12.    Under the Treaty of March 28, 1836, 7 Stat. 491, the Chippewas and Ottawas of northern Michigan ceded vast territory—the eastern half of Michigan's Upper Peninsula and the northern half of Michigan's Lower Peninsula—to the United States in return for a monetary payment far less than the value of the land.

13.    By the time Congress created the Indian Claims Commission ("Commission") in 1946 to resolve such inequities, the Sault Tribe was entirely landless.

14.    The Commission provided the Tribe with the opportunity to take the first step in the long journey towards securing land for its people. In 1971, the Commission determined that the amount of compensation paid by the United States for most land ceded under the 1836 treaty (and a prior treaty) was "unconscionable." 26 Ind. Cl. Comm. 550, 553 (Dec. 29, 1971) (Dkts. 18-E, 58). Specifically, the Commission found that the signatory tribes ceded land worth approximately $12.1 million; the United States paid approximately $1.8 million. *Id.* at 560-561. Accordingly, in a series of decisions, the Commission awarded the Sault Tribe and others more than $10 million in damages. *See id.* at 561; *see also* 32 Ind. Cl. Comm. 303, 309 (Dec. 26, 1973) (Dkt. 18-R); 35 Ind. Cl. Comm. 385 (Jan. 27, 1975) (Dkt. 364).

15.    Even then, however, no payments were made for decades. Although "[t]hese judgment funds were appropriated by Congress," the funds were "held in trust by the Department of the Interior for the beneficiaries." H.R. Rep. 105-352 at 8 (Oct. 28, 1997).

16.    The Sault Tribe has long been, and remains today, the largest Indian tribe in Michigan. At the time of its trust submissions, the Tribe had more than 40,000 enrolled members,

of whom more than 14,000 resided in Michigan's Lower Peninsula and approximately 11,000 resided within a 100-mile radius of the metropolitan area of Lansing, Michigan.  Those numbers have only increased since the Sault Tribe filed its trust submissions.

17.     Many of the Tribe's members who now reside in the southern portion of the State moved there to seek employment opportunities, often as a direct result of relocation efforts sponsored by the Bureau of Indian Affairs.  Many of those tribal members are in serious need of tribal services and employment opportunities.

18.     The Sault Tribe is also severely land-starved.  Acreage in the Upper Peninsula of Michigan was and remains woefully inadequate to meet the Tribe's needs.  At the time of the Tribe's trust submissions, only 2,220 acres of trust land served approximately 15,000 tribal members in the Upper Peninsula.  The Tribe has no trust lands in the Lower Peninsula of Michigan from which to provide employment and tribal services to the more than 14,000 tribal members who live there.  Indeed, upon information and belief, the Sault Tribe holds less land in trust per member than any other tribe in Michigan.

19.     In addition to those pressing land needs, the Sault Tribe is economically distressed. Although the Tribe operates casinos in the Upper Peninsula of Michigan, revenues from those facilities have been declining over a number of years, threatening the Tribe's ability to maintain even the current, inadequate level of governmental services to tribal members, including elder meal programs, food assistance for low-income families, reduced-rent and elder housing, day-care support, education initiatives, and cultural events.

**II.    CONGRESSIONAL ENACTMENT OF MILCSA**

20.    In 1997, Congress enacted MILCSA to settle once and for all the Sault Tribe's land claims against the United States, distributing judgment funds that the Sault Tribe and other tribes had been awarded on account of their land claims.

21.    MILCSA had two principal purposes.  First, Congress sought "to provide for the fair and equitable division of the judgment funds [awarded by the Commission and appropriated by Congress] among the beneficiar[y]" tribes.  111 Stat. at 2653.  MILCSA therefore provides a formula for allocating the funds among these tribes—the bulk of which went to the Sault Tribe and the Bay Mills Indian Community ("Bay Mills Tribe").  A congressional sponsor of MILCSA described the statute as "a historic step in bringing about long awaited justice for the Chippewa and Ottawa Nations of Michigan.  The legislation before us now will provide a monetary compensation for 12 million acres of land ceded by these tribes over 160 years ago."  143 Cong. Rec. H 10,804, H 10,805 (Nov. 13, 1997) (Rep. Kildee).

22.    Second, Congress sought to "provide … the opportunity for the tribes to develop plans for the use or distribution of their share of the funds" to promote tribal economic self-sufficiency, including through the acquisition of land.  111 Stat. at 2653; *see id.* at 2655.

23.    To accomplish those objectives, the Act contains separate plans and provisions governing the distribution and use of funds by the Bay Mills Tribe and the Sault Tribe.

24.    Section 107 of MILCSA governs the "Plan for Use and Distribution of Bay Mills Indian Community Funds."  111 Stat. at 2653, 2658.  In that section, as relevant here, the Act directs the creation of a Land Trust fund, the earnings of which were to be used "exclusively for improvements on tribal land or the consolidation *and* enhancement of tribal landholdings through

purchase or exchange." §107(a)(3), 111 Stat. at 2658 (emphasis added).  The Act specifies that "[a]ny land acquired with funds from the Land Trust shall be held as Indian lands are held."  *Id.*

25.     MILCSA uses different statutory language in creating a judgment fund for the Sault Tribe.  Section 108 of MILCSA governs the "Plan for Use of Sault Ste. Marie Tribe of Chippewa Indians of Michigan Funds."  111 Stat. 2653, 2660.  It creates a "Self-Sufficiency Fund" that can be used for various purposes, depending on whether the relevant funds are "principal" or "interest," 111 Stat. at 2660-2662:

a.     *Principal*.  Under Section 108(b), principal funds may be used for any "investments or expenditures" that the Sault Tribe's Board "determines" would (1) relate to "economic development beneficial to the tribe" or "development of tribal resources"; (2) "financially benefi[t] … the tribe and its members"; or (3) "consolidate or enhance tribal landholdings."  111 Stat. at 2661.  Congress assigned the Secretary no role in determining whether such expenditures would further those purposes.

b.     *Interest*.  Under Section 108(c), "interest and other investment income" may be "distributed" by the Board for any of five purposes:  (1) "as an addition to the principal"; (2) "as a dividend to tribal members"; (3) "as a per capita payment to some" category of tribal members designated by the Sault Tribe's Board; (4) "for educational, social welfare, health, cultural, or charitable purposes which benefit" the Sault Tribe members; or (5) "for consolidation *or* enhancement of tribal lands."  111 Stat. at 2661 (emphasis added). Congress again assigned the Secretary no role in determining whether such expenditures would further those purposes.

26.     Section 108 of MILCSA also carefully distinguishes between land acquired by the Sault Tribe with principal and land acquired by the Tribe with interest.  Section 108(b)(4) provides

that lands acquired with *principal* "shall be held as Indian lands are held," 111 Stat. at 2661,

similar to the language in the Bay Mills Tribe's section of MILCSA.  Section 108(f), by contrast,

mandates that lands acquired with *interest* "shall be held in trust by the Secretary for the benefit of

the tribe."  *Id.* at 2662.

27.     Congress delegated the Secretary no role in determining whether the Board

properly expended funds under Section 108(c), including for the purchase of land.  To the

contrary, Congress specifically directed that the Secretary's approval is not required "for any

payment or distribution from the principal or income of the Self-Sufficiency Fund," and the

Secretary "shall have no trust responsibility for the investment, administration, or expenditure of

the principal or income of the Self-Sufficiency Fund."  111 Stat. at 2661.

28.     The text and structure of MILCSA thus plainly establish that Congress intended the

Sault Tribe's Board, not the Secretary, to determine how funds should be expended, and that

Congress imposed a mandatory, non-discretionary duty on the Department to take into trust any

land purchased with interest from the Self-Sufficiency Fund.

## III.   THE SOLICITOR'S *BAY MILLS OPINION LETTER* ADOPTS A GEOGRAPHIC PROXIMITY REQUIREMENT FOR "ENHANCEMENT" IN A SEPARATE PROVISION OF MILCSA

29.     On December 21, 2010, the Office of the Solicitor at the Department of the Interior

issued an opinion letter responding to a request by the Bay Mills Tribe asking—as relevant

here—whether its purchase of land in Vanderbilt, Michigan using money from its Land Trust was

in conformance with MILCSA Section 107 (quoted *supra* ¶ 24).  *See* Letter from Hilary C.

Tompkins, Solicitor of the U.S. Dep't of the Interior, to Michael Gross, counsel for Bay Mills

Indian Community 1 (Dec. 21, 2010) ("*Bay Mills Opinion Letter*") (Ex. I).

30.     The Solicitor held that the purchase did not comply with Section 107 because the

purchase was not, in her view, for "'the consolidation and enhancement of tribal landholdings.'"

*Bay Mills Opinion Letter* 4.  (As noted above, Section 107 uses the phrase "consolidation *and* enhancement," while Section 108, relating to the Sault Tribe, uses the disjunctive "consolidation *or* enhancement."  *Compare supra* ¶24 *with id.* ¶25(b).)

31.     Central to the Solicitor's legal analysis was her determination that the Vanderbilt parcel was too far away from Bay Mills' existing lands to consolidate and enhance those lands. The Solicitor relied on a dictionary definition of "enhance" as meaning "to make greater, as in cost, value, attractiveness, etc.; heighten; intensify; augment."  *Bay Mills Opinion Letter* 4.  Based on that definition, she reasoned that "even under an interpretation where *enhancement* includes the addition of new land, there must be some connection to benefiting existing tribal landholdings." *Id.* at 6.  That standard was not satisfied, the Solicitor determined, "[b]ecause the Vanderbilt site is very far [namely, 85 miles] from all other tribal landholdings" and thus "cannot be said to enhance any of them."  *Id.*

32.     The Solicitor concluded that MILCSA Section 107 "simply cannot be read to authorize the Tribe to purchase additional landholdings in any geographic location with no connection to the intended purposes of [] MILCSA."  *Bay Mills Opinion Letter* 6.  As explained further below, the Department has continued to rely on this narrow understanding of enhancement, applying it to the Sault Tribe's trust submissions under Section 108.

## IV.    THE SAULT TRIBE'S FEE-TO-TRUST SUBMISSIONS AND MULTI-YEAR ENGAGEMENT WITH THE DEPARTMENT

33.     By 2012, the Sault's Tribe's economic situation was increasingly tenuous, owing to a confluence of factors.  To begin with, as explained above, the Sault Tribe is exceedingly land-poor, despite being the largest Indian tribe in Michigan.  At the time of the trust submissions, the Tribe held only 2,200 acres of trust land to serve approximately 15,000 members in the Upper Peninsula.  Moreover, the Tribe held (and still holds) no trust lands at all in the Lower Peninsula

from which to provide employment and tribal services to the more than 14,000 members who live there.

34.     Moreover, revenue from the Tribe's existing casinos—already modest due to their location in relatively remote areas of the Upper Peninsula—had experienced a 24.5 percent decline in the decade before the trust submissions, owing to competition from the Michigan State Lottery and new casinos in the Lower Peninsula.  Indeed, due to the combination of its substantial tribal membership and limited resources generated in the Upper Peninsula, in 2013 the Sault Tribe generated by far the lowest gaming revenues per tribal member of any Michigan tribe—revenues that were and are inadequate to cover basic capital costs, crucial maintenance of existing facilities, and current workforce and benefit levels.

35.     In an attempt to improve its dire financial position, the Sault Tribe settled on an economic development plan to open a casino in the Lower Peninsula.  Under IGRA, casino-type gaming facilities (called "Class III gaming" under IGRA) are permitted only on "Indian lands."  25 U.S.C. §2710(d)(1).  "Indian lands" are defined, as relevant here, to include trust lands.  *Id.* §2703(4)(B).  Accordingly, the Tribe planned to acquire land in the Lower Peninsula with interest from the Self-Sufficiency Fund, triggering the Secretary's mandatory duty to take that land into trust under MILCSA Section 108 (cited above) and creating "Indian lands" for purposes of IGRA.

36.     In 2012, the Sault Tribe's Board—exercising its authority under tribal law as well as its responsibilities under MILCSA—elected to purchase property in two locations in Michigan's Lower Peninsula to be used for gaming consistent with IGRA.  The Board specifically "determine[d]" that those purchases "will consolidate or enhance tribal landholdings [and] will generate an economic development opportunity beneficial to the Tribe and its members."

Resolution No. 2012-11, at 2 (available at Ex. III at 115-117); Resolution No. 2012-250 (available at Ex. II at 39-42).

## A.    The Tribe's 2014 Fee-To-Trust Submission

37.    On June 10, 2014, after a lawsuit by the State of Michigan to stop the Tribe from seeking to have land taken into trust was dismissed, the Sault Tribe presented two mandatory fee-to-trust submissions to the Department.  The first submission was for approximately 71 acres of land located in New Boston (Huron Charter Township), Wayne County, Michigan, known as "the Sibley Parcel."  *See* Sibley Submission (Ex. II).  The second submission was for approximately 2.26 acres composed of two parcels in Lansing, Michigan, known as the "Corner Parcel" and the "Showcase Parcel" ("Lansing Parcels").  *See* Lansing Submission (Ex. III).[1]

38.    In these submissions, the Tribe explained that the Department has a mandatory obligation to take land purchased with interest from the Self-Sufficiency Fund into trust under Section 108(f) of MILCSA.  As a threshold matter, the Tribe noted that the statutory authority to determine that a particular expenditure complies with the purposes set forth in Section 108(c) of MILCSA is "vested exclusively with the Board," and the Tribe explained that the Board had, in fact, determined that the acquisitions at issue were for the "consolidation or enhancement of tribal lands."  Lansing Submission 8-9.  The Tribe attached an affidavit from its Chief Financial Officer confirming that the parcels of land had been (or would be, as applicable) purchased with interest from the Self-Sufficiency Fund, thus triggering the Department's mandatory duty to hold them in trust.

---

[1]    In making the mandatory trust submissions, the Tribe explained that "[t]he Secretary's non-discretionary duty to take land into trust does not depend in any way on the purposes for which the land may be used.  *See* 25 C.F.R. §151.11 (Secretary shall consider the purposes of an off-reservation acquisition only when 'the acquisition is not mandated')."  Lansing Submission 4-5 & n.1.  Nonetheless, to be fully transparent, the Tribe explained that it anticipated conducting gaming activities on the land consistent with IGRA.

39.     Anticipating that, in reviewing the trust submissions under Section 108(f), the Department would assume for itself the Board's exclusive power to determine whether the acquisitions furthered a legitimate purpose under MILCSA—as the Department had done in the *Bay Mills* case—the Tribe then explained, as a textual matter, why the acquisitions satisfied Section 108(c) of MILCSA.

40.     The Tribe made two principal textual arguments that the Sibley and Lansing acquisitions would be an "enhancement" of tribal lands under Section 108(c)(5).  First, the Tribe argued that the plain meaning of "enhancement" includes the addition of new land.  Specifically, the Tribe argued that "[a]cquisition of the parcels will be an 'enhancement' of the Tribe's existing land base because it will augment that land base by increasing the total land possessed by the Tribe."  Lansing Submission 9.

41.     Furthermore, the Tribe explained that the Solicitor's prior geographic-proximity interpretation of "enhancement" in the *Bay Mills Opinion Letter* should not be applied to the Tribe's submission because, among other things, the Bay Mills section of MILCSA uses different language and because a later court decision had squarely rejected the Solicitor's interpretation. *See* Lansing Submission 10; *Michigan v. Bay Mills Indian Community*, No. 10-cv-1273, 2011 WL 13186010, at *5, *6 (W.D. Mich. Mar. 29, 2011) (distinguishing between consolidation and enhancement and explaining that acquisition of parcel more than 100 miles from existing tribal lands "is an enhancement of tribal landholdings, as the additional land augmented, or made greater, the total land possessed by Bay Mills"), *rev'd on other grounds*, 695 F.3d 406 (6th Cir. 2012), *aff'd*, 134 S. Ct. 2024 (2014).

42.     Second, the Tribe argued in the alternative that—if "enhancement" required acquisitions to increase the value of preexisting landholdings, as the Solicitor had opined in her

*Bay Mills Opinion Letter*—these purchases would increase the value of the Tribe's Upper

Peninsula lands and of tracts in the Lower Peninsula located near the Sibley and Lansing Parcels.

The Tribe explained with respect to the Lansing Parcel, for example, that "[o]nce the parcel is

acquired in trust, the Tribe anticipates that it will generate revenues that will be used to improve,

restore, or otherwise increase the usefulness or value of the Tribe's existing lands."  Lansing

Submission 10.  As evidence in support of that proposition, the Tribe attached and described Tribal

Resolution 2012-11, which mandated that 10 percent of annual income from the project be

deposited in the MILCSA Self-Sufficiency Fund; that 3 percent of annual income be distributed

for tribal social services; and that 2 percent of annual income be used to establish a college

scholarship program for tribal members.  Lansing Submission 115-117.  The Tribe also submitted

as evidence a similar resolution for the Sibley Parcel.  Sibley Submission 39-42.

43.     The Tribe also argued that the Sibley and Lansing acquisitions are for "educational,

social welfare, health, cultural, or charitable purposes which benefit the members of the Sault Ste.

Marie Tribe" under Section 108(c)(4).  It explained that the acquisitions "will provide a land base

for the thousands of tribal members who live in southern Michigan and other downstate

communities, will facilitate the delivery of services to those tribal members, will generate

revenues necessary for the provision of social services, and will create hundreds of jobs for those

members," again citing as evidence the tribal resolutions.  Lansing Submission 10-11.

**B.     The Tribe's Subsequent Submissions To The Department**

44.     For nearly 30 months—between June 2014 and January 2017—the Tribe engaged

in an extended back and forth with the Department, which declined to fulfill its mandatory duty to

take the land into trust while it sought additional evidence, invited additional briefing, and then

asked yet again for more evidence without providing any guidance as to why the Tribe's evidentiary submissions were insufficient.

45.     On October 17, 2014, the Tribe received a letter from the Department seeking additional information regarding the trust submissions.  The letter indicated that the Tribe needed to submit additional financial records documenting that the parcels were purchased with interest from the Self-Sufficiency Fund.  The letter stated that a report from an independent accounting firm indicating that "only funds from the appropriate account were used and they were sufficient for the purchase" would be sufficient.  It also asked the Tribe to submit "additional information … to show how each parcel will be used for the consolidation or enhancement of tribal lands."

46.     On April 22, 2015, after further communication and engagement with the Department, the Tribe made a substantial Supplemental Submission, which included six additional pieces of evidence.  *See* Supplemental Submission (Ex. IV).  Most of the additional evidence further demonstrated why "[t]he Sibley and Lansing acquisitions will … enhance—that is, make more valuable—existing tribal lands in the Upper Peninsula" even under the Secretary's erroneous interpretation of "enhancement."  Supplemental Submission 9.

47.     Thus, for example, the Tribe submitted a sworn affidavit from the Chief Financial Officer ("CFO") of the Tribe's existing casinos, explaining the decline in gaming revenues from existing facilities and opining that "both properties" (namely, the Sibley and Lansing Parcels) "together and separately will substantially enhance the Tribe's current land holdings."  Rick McDowell Aff. ¶ 15 (available at Ex. IV at 66-78).  Specifically, the CFO stated that "the two trust acquisitions will allow the operation of casinos that, in turn, will enable the Tribe to make substantial improvements to its existing facilities on tribal lands in the Upper Peninsula."  *Id.*  He explained that "one of the primary purposes of the trust acquisitions is to enable needed revenue

streams to ensure that the Tribe is able to maintain and improve the value of the Tribe's existing land holdings." *Id.* The CFO added that the future casinos would also provide employment to tribal members. With respect to the Lansing Parcel, he "anticipate[d] that many visitors and employees will be members of the Tribe" because "thousands of members of the Tribe live in the Lansing area." *Id.* ¶ 12. And with respect to the Sibley Parcel, he similarly observed that "thousands of members of the Tribe … reside in the area." *Id.* ¶ 13.

48.     The Tribe also submitted an affidavit from the Director of the Tribal Housing Authority. That affidavit explained that "[t]he Tribe's Housing Authority is presently unable to service the several hundred pending housing applications because of the limited stock of available housing." Joni Talentino Aff. ¶ 8 (available at Ex. IV at 80-81). The affidavit further stated that "increased gaming revenue is the most viable means of increasing housing services availability." *Id.* ¶ 9.

49.     That same evidence further demonstrated why the Sibley and Lansing acquisitions are "for educational, social welfare, health, cultural, or charitable purposes which benefit the members of the Sault Ste. Marie Tribe" under Section 108(c)(4) of MILCSA. As noted above, the Tribe's 14,000 members in the Lower Peninsula (who relocated there often as a direct result of efforts sponsored by the Bureau of Indian Affairs) are in serious need of tribal services and employment opportunities—which the new casinos would provide. With respect to the Tribe's members in the Upper Peninsula, the gaming revenue would directly fund much-needed social services such as housing.

50.     In addition to that evidence and in direct response to the Department's request, the Tribe submitted an independent audit report confirming that the Tribe, in fact, had purchased the relevant land with interest from MILCSA's Self-Sufficiency Fund. The report summarized fund

principal, additions to principal, interest, losses, fees, expenditures, and other assets from 1998 to 2013, and concluded that the Tribe's average annual income from the fund between 2011 and 2013 was $2.6 million, more than enough to cover the purchase of the Sibley and Lansing Parcels.  The report thus fully satisfied the Department's request.

51.     After further meetings and discussions with Department officials over the course of many months, during which the Tribe explained the evidence it had provided in detail and repeatedly urged the Department to fulfill its mandatory duty to take the land into trust, the Department instead took the unusual step of issuing a briefing schedule for other tribes to comment on the Tribe's mandatory trust submissions.

52.     On April 6, 2016, competing gaming tribes submitted an opposition.  Among other things, they argued that the Lansing and Sibley acquisitions would not enhance or consolidate tribal lands under the Solicitor's interpretation of "enhancement" in the *Bay Mills Opinion Letter*.

53.     On May 20, 2016, the Sault Tribe filed its reply.  Relying on the evidence included in its prior submissions, the Tribe argued that "the acquisitions will increase the value of the Tribe's existing lands in the Upper Peninsula" because "[a]s the Tribe has amply demonstrated—and the objecting tribes do not dispute—revenues from economic development projects are desperately needed to improve existing tribal lands and facilities."  The Tribe argued that the evidentiary record thus demonstrated "a logical, direct, and clear link between the land acquisitions and increases in the value of the Tribe's existing lands."

54.     On November 18, 2016—after yet another meeting with the Department—the Sault Tribe received an e-mail from the Department asking further questions, including:  "What is the impact, if any, of the Solicitor's statement in [the *Bay Mills Opinion Letter*] that '[b]ecause the Vanderbilt site is very far from all other tribal landholdings, it cannot be said to enhance any of

them'?" The Department also vaguely asked the Tribe if it wished to submit additional evidence as to how the trust submissions would enhance existing lands, without identifying any concerns with the substantial evidence the Tribe had already submitted on that very issue.

55. On December 9, 2016, the Tribe made an additional submission in response to the Department's questions. In that submission, the Tribe explained why it would be legal error to apply the interpretation of "enhancement" articulated in the *Bay Mills Opinion Letter* here. The Tribe further reiterated its longstanding position, based on evidence already in the administrative record, that revenue from gaming operations on the parcels would directly support economic development on and improvement of existing tribal lands.

## V. THE DEPARTMENT'S DENIAL OF THE TRIBE'S FEE-TO-TRUST SUBMISSIONS

56. The Department issued a final denial of the Tribe's mandatory fee-to-trust submissions on July 24, 2017, in a letter from James Cason, Associate Deputy Secretary ("July Denial Letter") (Ex. VI). The July Denial Letter incorporates by reference a January 2017 Letter from Ann Marie Bledsoe Downes, Deputy Assistant Secretary for Policy and Economic Development ("January Letter") (Ex. V). Read together, these letters set forth the Department's rationales for rejecting the Tribe's MILCSA submissions.

### A. The January Letter

57. On January 19, 2017—two and a half years after the initial trust submissions and after making multiple additional submissions to the Department—the Tribe received the January Letter from the Department responding to the trust submissions.

58. At the outset, consistent with the plain meaning of the statute, the Department endorsed the Tribe's position that MILCSA imposes a *mandatory* trust responsibility on the Secretary. January Letter 3.

59.     As it had in its *Bay Mills Opinion Letter*, however, the Department took the legal position that it was required to determine for itself "[i]f lands are acquired using Self-Sufficiency Fund income in accordance with the provisions of Sections 108(c) and (f)." January Letter 3.  The Department cited no legal authority for its position that MILCSA empowers the Secretary under Section 108(f) to determine whether the Tribe's Board properly expended funds under Section 108(c).

60.     The Department went on to determine that the Tribe's trust submissions did not satisfy the "consolidation or enhancement" provision in Section 108(c) of MILCSA.  Relying on the analysis set forth in the *Bay Mills Opinion Letter*, the Department summarily rejected the Tribe's position that acquisitions that augment the Tribe's land base are by definition "enhancement of tribal lands."  *See* January Letter 2, 4.  The Department offered no explanation for reading Section 108(c) to mean the same thing as Section 107, given the textual difference between those provisions—namely, Section 107 uses the conjunctive "and," while Section 108(c) uses the disjunctive "or."  *See Loughrin* v. *United States*, 134 S. Ct. 2384, 2390 (2014).

61.     With respect to the Tribe's argument that the acquisitions satisfied the Department's erroneous *Bay Mills* standard, the Department claimed—without discussing any of the evidence submitted by the Tribe—that the Tribe had not made "a sufficient showing of how lands in the Upper Peninsula will be enhanced by the acquisition of the parcels." January Letter 5. Because the Tribe had demonstrated in its submissions that the acquisitions would increase the value of the Tribe's existing lands by enabling reinvestment in and improvement of those lands, the Department appeared to be embracing an interpretation of "enhancement" that required acquisitions to result in an immediate increase in the economic value of existing lands.  But the Department did not explain what kind of evidence could satisfy its interpretation.

62.     The January Letter relegated the Tribe's alternative argument—that the acquisitions were "for educational, social welfare, health, cultural, or charitable purposes which benefit the members of the" Tribe under Section 108(c)(4)—to a footnote.  January Letter 2.  The Department cursorily asserted that the Tribe's argument was "too attenuated to satisfy MILCSA." *Id.* at 4 n.25.  Although the Department acknowledged that the purchase of land "for a school, a job training center, a health clinic, or a museum" could satisfy Section 108(c)(4), the Department opined that the Tribe "may not satisfy the Section 108(c)(4) requirement that *Self-Sufficiency Fund* interest and income be spent on social welfare purposes by using Self-Sufficiency fund income to start an economic enterprise, which may generate its own profits, which profits might then be spent on social welfare purposes." *Id.*  The Department ignored the Tribe's evidence that new casinos would directly provide employment opportunities for the Tribe's members in the Lower Peninsula.

63.     Moreover, notwithstanding the Department's earlier statement that a report from an independent accounting firm demonstrating that the acquisitions were made with interest from the Self-Sufficiency Fund would satisfy that requirement, and the Tribe's submission of such a report in its Supplemental Submission on April 22, 2015, the Department declined to address whether the parcels were purchased with Fund interest.  *See* January Letter 6 ("we need not consider whether the parcels have been (or would be) acquired using Self-Sufficiency Fund income").

64.     The January Letter did not deny the Tribe's submissions outright.  Instead, the letter indicated that the Department would keep the Tribe's submissions open and that the Tribe could submit additional evidence—without providing any guidance as to the type of evidence the Department thought could satisfy the legal standard it had adopted (and, as explained, without addressing the substantial evidence the Tribe had already submitted).  January Letter 6.

B.      **The July Denial Letter**

65.      In light of the ambiguity of the January Letter, the Tribe subsequently met with the Department to clarify the Department's legal position on the trust submissions.  During that meeting, the Tribe requested a letter from the Department that would either clarify what type of evidence would satisfy the Department's legal understanding of "enhancement" or provide a final decision regarding the submissions.

66.      On July 24, 2017, more than three years after the Tribe had made its trust submissions, the Tribe received the July Denial Letter from the Department, which incorporated the analysis of the January Letter and finally denied the Tribe's fee-to-trust submissions.

67.      As with the January Letter, the July Denial Letter makes clear that the Department adopted and applied the same geographic-proximity interpretation of "enhancement" for MILCSA Section 108 that the Solicitor had applied for MILCSA Section 107 in the *Bay Mills Opinion Letter*.  *See, e.g.*, January Letter 4; July Denial Letter 2-3.  Using that legally flawed interpretation of "enhancement," the Department concluded that the geographic distance between the Sibley and Lansing Parcels and the Tribe's Upper Peninsula land, by itself, meant that the purchases could not "enhance[]" tribal lands.  July Denial Letter 3-4.

68.      In the *Bay Mills Opinion Letter*, the Solicitor had refused to treat the Bay Mills Tribe's Vanderbilt parcel as enhancing tribal landholdings under Section 107 of MILCSA, given that it was more than 85 miles from existing tribal landholdings.  Likewise, in the July Denial Letter, the Department stated that "[h]ere, the distances are even greater [than those in the *Bay Mills Opinion Letter*]—the Tribe's headquarters is approximately 260 miles (287 miles by road) from the Lansing Parcels, and approximately 305 miles (356 miles by road) from the Sibley Parcel."  July Denial Letter 4; *see id.* at 4 n.23 (again citing distances).

69.      The July Denial Letter also confirmed the Department's suggestion in its January

letter that, in its view, in order to "enhance tribal lands," the acquisition of new land would need to

cause a direct and immediate increase in the monetary value of specific parcels of land that the

Tribe already owned, simply as a result of the new land purchase and without any intervening

events.  For instance, the Department faulted the Tribe for failing to demonstrate through "real

estate appraisals or assessments" that the Sibley and Lansing acquisitions would, by themselves,

directly increase the monetary "value" of existing lands.  July Denial Letter 3; *see also id.* at 4

(asserting Tribe failed to submit "evidence of a tangible increase of value").  The Department thus

made clear that, in its view, value-enhancing improvements on existing land funded by revenues

generated as a result of a new acquisition would not constitute "enhancement."

70.      The July Denial Letter nonetheless went on to address the Tribe's alternative

argument that the Sibley and Lansing acquisitions would increase the value of existing tribal lands

by enabling reinvestment in and improvement of those lands, along with creating employment

opportunities.  July Denial Letter 3-4.  It repeated the January Letter's statement—which was

plainly wrong in light of the existing record—that the Tribe had submitted no evidence in support

of that argument.  *Id.*; January Letter 5.  For example, the Department incorrectly stated that "the

Tribe has not offered any evidence of its plans to use the gaming revenue to benefit its existing

lands or its members," July Denial Letter 4—notwithstanding the tribal resolutions and affidavits

cited above that unequivocally demonstrated the Tribe's commitment to use gaming revenue to

benefit its existing lands and its members.  Similarly, the Department incorrectly stated that "the

Tribe fails to cite any evidence" that its acquisitions will "provide employment … to its members

nearby," *id.* at 3—again, notwithstanding the affidavits cited above and the common-sense

proposition that opening a modern casino in an area where thousands of the Tribe's members reside will create jobs for those members.

71.     Like the January Letter, the July Denial Letter purported to reserve the question whether the parcels had been purchased with interest, even though the Sault Tribe had provided all the necessary evidence to establish conclusively that the parcels were purchased with interest from the Self-Sufficiency Fund in April 2015.  July Denial Letter 3 n.15.

72.     The July Denial Letter—which, again, incorporates the analysis of the January Letter—constitutes "final agency action," 5 U.S.C. §704, because it represents the consummation of the agency's decisionmaking process regarding the Tribe's fee-to-trust submissions and because the July Denial Letter determines the Tribe's rights with respect to the Sibley and Lansing Parcels, from which legal consequences will flow.

## COUNT ONE

### THE JULY DENIAL LETTER EXCEEDS THE AGENCY'S STATUTORY AUTHORITY, IS CONTRARY TO LAW, AND IS *ULTRA VIRES*

### (Administrative Procedure Act, 5 U.S.C. §706(2)(A))

73.     Paragraphs 1 through 72 are incorporated by reference as if set forth fully herein.

74.     Under the APA, "the reviewing court shall … hold unlawful and set aside agency action … found to be … not in accordance with law."  5 U.S.C. §706(2)(A).  The APA further requires the reviewing court to "decide all relevant questions of law" "[t]o the extent necessary." *Id.* §706.

75.     The Department's rejection of the Tribe's MILCSA trust submissions is contrary to law for at least four reasons.

76.     First, Congress did not delegate to the Department the legal authority to determine whether a land purchase is an "enhancement of tribal lands" or furthers "social welfare …

purposes" under Section 108(c) of MILCSA.  Rather, the text and structure of MILCSA grant the

Sault Tribe's governing body, its Board, the exclusive authority to make that determination.

Section 108(f) gives the Secretary no authority to revisit whether the Board has properly expended

funds under Section 108(c).  At a minimum, because Congress did not delegate to the Department

the power to define the terms "enhancement of tribal lands" or "social welfare … purposes," the

Department's construction of those terms should be accorded no deference.

      77.    Second, the statutory phrase "enhancement of tribal lands" unambiguously extends

to all land acquisitions that increase or augment the Tribe's land holdings.  "Enhance" means to

"make greater" or "augment" (as the Solicitor herself concedes in the *Bay Mills Opinion Letter*).

And the object of the enhancement is a plural noun, "tribal lands"—which refers to land

collectively, not to a specific parcel of land.  Accordingly, a land acquisition that increases the size

or value of the Tribe's lands as a whole is an "enhancement of tribal lands" under MILCSA

Section 108(c).  Nothing in the statute supports reading "enhancement of tribal lands," as the

Secretary did here, to mean "an increase in the monetary value of land already owned by the

Tribe."  The Tribe's interpretation is supported by the text, structure, and purposes of the statute, as

well as common usage in English.  Moreover, it is compelled by the Indian canon of construction,

which requires that any statutory ambiguities be read in favor of the Tribe and trumps any

deference to the agency that might otherwise be appropriate.

      78.    Third, even if the phrase "enhancement of tribal lands" were ambiguous and even if

the Department were entitled to deference, the Department's geographic-proximity requirement

(borrowed from its *Bay Mills Opinion Letter*) is unreasonable, inconsistent with any sensible

construction of Section 108 of MILCSA, and arbitrary and capricious.  The Department's

requirement has no textual basis in the word "enhancement," conflicts with the collective noun

"tribal lands," and renders the statute's "consolidation" provision entirely superfluous.  Moreover, it vitiates the purposes of MILCSA:  Limiting land acquisitions to regions adjacent or very close to the Tribe's existing lands would never permit the Tribe to achieve the self-sufficiency through land acquisition that MILCSA expressly contemplates.  Congress was, after all, fully aware of the Tribe's diaspora into the Lower Peninsula and yet chose not to include language limiting land acquisitions to the Upper Peninsula.  And even if the *Bay Mills Opinion Letter* were a permissible construction of Section 107 of MILCSA, the Department acted arbitrarily and unreasonably in extending that construction to Section 108 of MILCSA despite, among other things, materially different statutory text.

79.     Fourth, the statutory phrase "for educational, social welfare, health, cultural, or charitable purposes which benefit [tribal] members" in Section 108(c)(4) unambiguously includes any land acquisitions that will serve the aforementioned purposes.  That conclusion is compelled by the text, structure, and purpose of MILCSA.  The Department's exclusion of "economic ventures" that will promote the social welfare of the tribe through employment of tribal members and increased revenue for tribal services is unreasonable.

80.     As a matter of law, the Tribe's acquisitions are "for educational, social welfare, health, cultural, or charitable purposes which benefit [tribal] members" under Section 108(c)(4).  Congress has permitted Indian gaming precisely because it "provides revenues to run tribal governments and to provide for the great social welfare needs of tribes."  *Implementation of Indian Gaming Regulatory Act:  Oversight Hearing before the Subcomm. on Native American Affairs of the H. Comm. on Natural Resources*, 103rd Cong. 10 (June 25, 1993) (statement of Chairman Richardson).  And the Tribe's own resolutions mandate that portions of the revenues generated

from the acquisitions be set aside to support specific social programs for elders, scholarships, and other social welfare purposes.

81.     For these reasons and others, the Court should vacate the July Denial Letter.  The Court should also declare that the Board has the exclusive power to determine whether land acquisitions satisfy the purposes set forth in Section 108(c) of MILCSA.  In the alternative, the Court should declare that "enhancement" under MILCSA Section 108 extends to all land acquisitions that increase or augment the Tribe's lands; that land acquisitions for economic ventures that will provide employment and revenue for social services are "for educational, social welfare, health, cultural, or charitable purposes which benefit [tribal] members"; and that the Tribe's two trust submissions satisfy both standards.

## COUNT TWO

## THE JULY DENIAL LETTER IS ARBITRARY AND CAPRICIOUS

## (Administrative Procedure Act, 5 U.S.C. §706(2)(A))

82.     Paragraphs 1 through 81 are incorporated by reference as if set forth fully herein.

83.     Under the APA, "the reviewing court shall … hold unlawful and set aside agency action … found to be … arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. §706(2)(A).

84.     The July Denial Letter is arbitrary and capricious, is unsupported by substantial evidence, and constitutes unreasoned decisionmaking in multiple respects.

85.     For example, the Department's determination that the Sault Tribe submitted "no evidence" that the acquisitions would increase the value of existing lands is plainly contradicted by the administrative record.  The Tribe submitted significant evidence—for example, tribal resolutions, the affidavit from the CFO of Kewadin Casino, and the affidavit from the Director of the Tribal Housing Authority—supporting the Tribe's consistently stated position that the Sibley

and Lansing acquisitions would increase the value of the Tribe's existing lands by enabling

reinvestment in and improvement of those lands in both the Upper and Lower Peninsula of

Michigan.  The Department inexplicably ignored this evidence.

86.     Moreover, the Department's assertion that "the Tribe has not offered any evidence

of its plans to use the gaming revenue to benefit its existing members," July Denial Letter 4, not

only ignores evidence in the administrative record that demonstrated precisely that point, but is

independently arbitrary and capricious because it irrationally overlooks that IGRA *requires* that

gaming revenues principally be used for such purposes.  *See* 25 U.S.C. §§2710(b)(2)(B),

(d)(1)(A)(ii).  Indeed, in initially making the trust submissions, the General Counsel of the Tribe

informed the Department that the submissions "represent the culmination of many years of hard

work by the Sault Tribe and form a critical part of the Tribe's ongoing efforts to restore its

economic well-being and provide for its members."  Lansing Submission 1.  The Department has

never offered any reason to doubt the veracity of that representation by the Tribe's chief legal

official.

87.     For the same reasons, the Department's rejection of the Tribe's well-founded

position that the acquisitions are "for educational, social welfare, health, cultural, or charitable

purposes which benefit [tribal] members" under Section 108(c)(4) is arbitrary and capricious.

88.     Finally, in light of several aspects of the Department's decisionmaking

process—the lengthy delay in the Department's review, the incorrect, inconsistent, and

unexplained statements made in the January Letter and the July Denial Letter, and the

Department's refusal to acknowledge, let alone provide any meaningful analysis of, the evidence

submitted by the Tribe—the Department's decision appears to have been based on impermissible

considerations or factors that Congress did not intend the Department to use in reviewing

MILCSA submissions.  That, too, renders the July Denial Letter arbitrary and capricious.

89.     Because the Department "offered an explanation for its decision that runs counter

to the evidence before the agency," its decision is plainly "arbitrary and capricious."  *Motor*

*Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Where,

as here, an agency simply "ignore[s] evidence contradicting its position," it violates the APA.

*Butte Cty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

90.     For those reasons and others, the July Denial Letter is arbitrary and capricious,

unsupported by substantial evidence, and the product of unreasoned decisionmaking.  This Court

should accordingly vacate the July Denial Letter.

**COUNT THREE**

**UNREASONABLE AGENCY DELAY AND MANDAMUS**

**(Administrative Procedure Act, 5 U.S.C. §706(1); Mandamus, 28 U.S.C. §1361)**

91.     Paragraphs 1 through 90 are incorporated by reference as if set forth fully herein.

92.     The APA imposes a non-discretionary duty on the Defendant to act on matters

before the Department "within a reasonable time," 5 U.S.C. §555(b), and grants this Court the

authority to "compel agency action unlawfully withheld or unreasonably delayed," *id.* §706(1).

Moreover, a party may invoke 28 U.S.C. §1361 "to compel an officer … of the United States or

any agency thereof to perform a duty owed to the plaintiff."

93.     The Department and the Secretary owe the Tribe a non-discretionary duty to accept

the Tribe's documentation of its "interest" purchase and to take the land into trust.  As explained

above, the Department's statutory obligation to take land into trust that has been purchased with

Self-Sufficiency Fund "interest" is clear, non-discretionary, and ministerial.  MILCSA *requires*

the Secretary to hold land in trust if the Tribe used interest income to purchase the property, as the

Tribe did here.  When an officer fails to perform this sort of "ministerial or non-discretionary act"

in the face of "a specific, unequivocal command" from Congress, a court has the authority not only

to require him to act, but also to direct him to take the mandated action.  *Norton v. Southern Utah*

*Wilderness Alliance*, 542 U.S. 55, 63-64 (2004) (internal quotation marks omitted); *see, e.g.*,

*Haneke v. Secretary of Health, Educ. & Welfare*, 535 F.2d 1291, 1296-1297 n.16 (D.C. Cir. 1976)

("a duty often becomes ministerial 'only after a court has reached its own judgment about a

disputed legal question and its application to a factual situation'").

94.     Here, the Tribe demonstrated that the acquisitions were made with interest by

submitting an affidavit and a verified accounting report confirming that the Parcels were (or would

be) acquired with interest income from the Self-Sufficiency Fund, which the Department indicated

would constitute sufficient documentation in its October 17, 2014 letter to the Tribe.  Nothing

remains for the Department to do other than the ministerial actions of stating that the land was

purchased with interest and taking the land into trust.

95.     Even setting aside the Department's violation of its non-discretionary duty, the

Department's conduct with respect to the Sault Tribe's fee-to-trust submissions has been marked

by unreasonable delays.  Over three years passed between the Sault Tribe's submissions for

mandatory trust acquisition in June 2014 and the Department's July Denial Letter in 2017.  This

delay is unwarranted and unreasonable for a simple administrative decision, involving a

mandatory duty and a comparatively small record—especially given the Tribe's dire need for

economic development to support necessary tribal governmental programs.

96.     This delay is particularly unreasonable when evaluated in light of the

Government's "well established" obligation to "act[] in a fiduciary capacity" when dealing with

- 29 -

tribal property, *Lincoln v. Vigil*, 508 U.S. 182, 194 (1993) (internal quotation marks omitted), and its "overriding duty … to deal fairly with Indians," *Morton v. Ruiz*, 415 U.S. 199, 236 (1974).

97.     And the Department has all but assured further delays.  As noted above, the Tribe has supplied the Department with evidence the Department itself indicated would be sufficient to demonstrate that the property was acquired with interest.  Nonetheless, the Department unreasonably refused to acknowledge that evidence and confirm that the parcels were purchased with interest in either the January Letter or the July Denial Letter.

98.     In light of the Department's record of unreasonable delay, if the Sault Tribe prevails on the Section 108(c) question (which it must, for the reasons stated above) and this Court simply vacated the Department's July Denial Letter without providing further direction, the Tribe would likely face another multi-year delay before the Department takes the Sibley and Lansing Parcels into trust.  Such further delay would seriously threaten the Tribe's ability to bring the project to fruition.  That result would violate the APA and defeat the purposes of MILCSA.

99.     To avoid that unlawful and inequitable result, this Court should hold that the Tribe has demonstrated, based on the existing administrative record and as a matter of law, that the parcels were purchased with interest and should order the Department to take the parcels into trust.

100.    In the alternative, pursuant to 5 U.S.C. §706(1), the Tribe is entitled to a judgment that the Department's failure to resolve the interest issue was unlawful and to injunctive relief compelling the Department to resolve that discrete question on an expedited timetable.  *E.g.*, *Public Citizen Health Research Grp. v. Auchter*, 702 F.2d 1150, 1159 (D.C. Cir. 1983).  Given the circumstances here, an order compelling the Department to resolve this question within 90 days is warranted.  This Court should retain jurisdiction to ensure timely compliance with its mandate. *E.g., Telecommunications Research & Action Ctr. v. FCC*, 750 F.2d 70, 81 (D.C. Cir. 1984)

("Whether or not these delays would justify mandamus, we believe they clearly warrant retaining jurisdiction.").

## PRAYER FOR RELIEF

101.    WHEREFORE, Plaintiff prays that the Court grant the following relief:

a.    Vacate, "hold unlawful," and "set aside" the July Denial Letter, 5 U.S.C. §706(2);

b.    Declare that the Tribe's Board has the exclusive authority to determine whether an expenditure of interest from the Self-Sufficiency Fund satisfies the purposes set forth in Section 108(c) of MILCSA;

c.    Declare that "enhancement" under MILCSA Section 108 extends to all land acquisitions that increase or augment the Tribe's land holdings and that the two trust submissions satisfy that standard, 28 U.S.C. §2201;

d.    Declare that land acquisitions to pursue economic ventures that will provide employment and necessary funds for social services are "for educational, social welfare, health, cultural, or charitable purposes which benefit [tribal] members" under MILCSA Section 108 and that the two trust submissions satisfy that standard, 28 U.S.C. §2201;

e.    Enter a declaration, injunction, or writ of mandamus compelling the Secretary to take the Sibley and Lansing Parcels into trust, 28 U.S.C. §1361; 5 U.S.C. §706(1); or issue a declaration, injunction, or writ of mandamus compelling the Secretary to resolve any remaining issues relating to the trust submissions within 90 days, 28 U.S.C. §1361; 5 U.S.C. §706(1);

  f.  Award Plaintiff its costs and reasonable attorney's fees in connection with

    this action, pursuant to 28 U.S.C. §2412 and other applicable authority;

  g.  Grant such other relief as the Court deems necessary, just, and proper; and

  h.  Retain jurisdiction for the purpose of enforcing the Court's order and

    judgment and for the purpose of taking appropriate action pursuant to 28

    U.S.C. §1361 and/or 5 U.S.C. §706(1).


Dated:  August 30, 2018      Respectfully submitted,

            /s/ Danielle Spinelli_____
            Danielle Spinelli (D.C. Bar No. 486017)
            Kelly P. Dunbar (D.C. Bar No. 500038)
            Arpit K. Garg (D.C. Bar No. 1033861)
            Kevin M. Lamb (D.C. Bar No. 1030783)
            WILMER CUTLER PICKERING HALE AND DORR
             LLP
            1875 Pennsylvania Avenue, NW
            Washington, DC 20006
            Tel.: (202) 663-6000
            Fax: (202) 663-6363
            danielle.spinelli@wilmerhale.com
            kelly.dunbar@wilmerhale.com
            arpit.garg@wilmerhale.com
            kevin.lamb@wilmerhale.com

            *Counsel for Plaintiff Sault Ste. Marie Tribe of*
            *Chippewa Indians*