# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS**,

Plaintiff,

v.

**DAVID BERNHARDT, *et al.***,

Defendants,

and

**SAGINAW CHIPPEWA INDIAN TRIBE OF MICHIGAN, *et al.***,

Defendant-Intervenors.

Case No. 1:18-cv-02035 (TNM)

---

## <u>MEMORANDUM OPINION</u>

"[T]he central, organizing question of Federal Courts doctrine involves allocations of authority: *Who* ought to have authority to give conclusive determinations of *which* kinds of questions?" Richard H. Fallon, Jr., *Reflections on the Hart & Wechsler Paradigm*, 47 Vand. L. Rev. 953, 962 (1994). This case is about who decides whether an Indian tribe acquired land for a permissible purpose—the Federal Government or tribal leaders. Finding that Congress vested tribal leaders with that decision here, the Court sets aside the Government's refusal to take land into trust for the Sault Ste. Marie Tribe of Chippewa Indians ("Sault" or the "Tribe").

The Tribe contends that this refusal was contrary to law and arbitrary and capricious under the Administrative Procedure Act ("APA"). For relief, the Tribe seeks vacatur of the decision and either an order compelling the Department to take the land into trust or an order

directing the Department to issue a new decision on an expedited basis.  The Tribe moves for summary judgment.  The Department and Intervenors—three commercial casinos ("Casinos"), the Nottawaseppi Huron Band of the Potawatomi ("NHBP"), and the Saginaw Chippewa Indian Tribe of Michigan ("Saginaw Tribe")—cross-move for summary judgment.

The Court agrees with Sault on the merits.  The Department overstepped its authority when it denied Sault's request to take land into trust because it believed the Tribe did not acquire the land for a proper purpose.  Congress gave the Department no role in policing Sault's land acquisitions.  And in any event, the land acquisition here was for a proper purpose under the relevant statute.  The Court declines, however, to order the Department to take any land into trust or to issue a new decision on an expedited basis.  The upshot is that the Court will grant in part and deny in part each motion for summary judgment, vacate the Department's decision, and remand to the agency for further proceedings.

## I.

Sault is a federally recognized tribe with more than 40,000 enrolled members.  A.R. 3113.[1]  It has a well-documented history.  *See Sault Ste. Marie Tribe of Chippewa Indians v. United States*, 576 F. Supp. 2d 838, 840–41 (W.D. Mich. 2008).  The Tribe descends from a group of Chippewa bands that occupied a large area in the Upper Great Lakes region.  *Id.*  In the nineteenth century, these ancestors ceded much of their land to the Federal Government.  *See* Treaty of March 28, 1836 (7 Stat. 491).

Alexis de Tocqueville starkly described the process by which the Federal Government obtained Indian lands in *Democracy in America*.  Government envoys would gather the tribe

---

[1]  Some pages of the administrative record, as they appear in the Joint Appendix, have multiple "AR" page numbers in their bottom right-hand corner.  For consistency, the Court will use the page number with the largest font size.

members together, coax them with promises of riches in lands undisturbed by European encroachment, and bribe them with trinkets like glass necklaces and tinsel bracelets. Alexis de Tocqueville, *Democracy in America* 403 (Simon & Brown ed. 2013) (1835-1840). He continues:

> If, when they have beheld all these riches, they still hesitate, it is insinuated that they have not the means of refusing their required consent, and that the government itself will not long have the power of protecting them in their rights. What are they to do? Half convinced, and half compelled, they go to inhabit new deserts, where the importunate whites will not let them remain ten years in tranquility. In this manner do the Americans obtain, at a very low price, whole provinces, which the richest sovereigns of Europe could not purchase.

*Id.*

Over a century later, Congress established the Indian Claims Commission to settle tribal land claims against the United States. *See* Act of Aug. 13, 1946, Pub. L. No. 79-726, 60 Stat. 1049, 1050. The Commission found that the 1836 treaty was "unconscionable." 26 Ind. Cl. Comm. 550, 553 (Dec. 29, 1971) (Docket Nos. 18-E and 58). The United States had paid the Chippewa bands $1.8 million for land worth $12.1 million. *Id.* As a remedy, the Commission awarded Sault and other tribes more than $10 million in damages. *Id.* at 561.

The question remained how to distribute these judgment funds among the beneficiary tribes. The answer came in the Michigan Indian Land Claims Settlement Act ("MILCSA"). *See* Pub. L. No. 105-143, 111 Stat. 2652 (1997). MILCSA is central to this case. Its express purpose is "to provide for the fair and equitable division of the judgment funds" among the beneficiary tribes "and to provide the opportunity for the tribes to develop plans for the use or distribution of their share of the funds." *Id.* § 102(b). The beneficiary tribes include Sault and the Bay Mills Indian Community, but not the intervenor tribes. *Id.* § 104.

Section 108 of MILCSA describes the plan for Sault. *Id.* § 105(a)(3). It directs the Secretary of the Interior to transfer the Tribe's share into a trust called the "Self-Sufficiency Fund." *Id.* § 108(a)(1)(A), (e)(1). The Tribe's board of directors is the "trustee" of this Fund and "shall administer the Fund in accordance with the provisions of" section 108. *Id.* § 108(a)(2). The "principal" of the Fund

> shall be used exclusively for investments or expenditures which the board of directors determines . . . (A) are reasonably related to . . . economic development . . . development of tribal resources . . . (B) are otherwise financially beneficial to the tribe and its members . . . or (C) will consolidate or enhance tribal landholdings.

*Id.* § 108(b)(1). The "interest and other investment income" of the Fund, meanwhile,

> shall be distributed . . . (1) as an addition to the principal of the Fund . . . (2) as a dividend to tribal members . . . (3) as a per capita payment to some group or category of tribal members designated by the board of directors . . . (4) for educational, social welfare, health, cultural, or charitable purposes which benefit the members of the [Tribe] . . . or (5) for consolidation or enhancement of tribal lands.

*Id.* § 108(c).

As we will see, the meaning of § 108(c)(5)—specifically, the phrase "enhancement of tribal lands"—is one of the main issues here. Section 108 also provides that "[n]otwithstanding any other provision of law," the Secretary's "approval . . . for any payment or distribution from the principal or income of the [Fund] shall not be required and [he] shall have no trust responsibility for the investment, administration, or expenditure of the principal or income." *Id.* § 108(e)(2). Finally, MILCSA directs that "[a]ny lands acquired using amounts from interest or other income of the [Fund] shall be held in trust by the Secretary for the benefit of the tribe." *Id.* § 108(f). The meaning of § 108(f) is the other main issue here.

While section 108 of MILCSA takes center stage, it helps to understand section 107, which establishes the plan for Bay Mills. *Id.* § 105(a)(2). Section 107 bears similarities to section 108 but is different in some critical respects. It provides that 20 percent of the tribe's

share goes into the "Land Trust." *Id.* § 107(a)(1). The tribe's Executive Council is the "trustee" of the Land Trust and "shall administer the [Trust] in accordance with" section 107. *Id.* § 107(a)(2). "The principal of the [Trust] shall not be expended for any purpose." *Id.* § 107(a)(4). The Trust's "earnings," meanwhile, "shall be used exclusively for improvements on tribal land or the consolidation *and* enhancement of tribal landholdings through purchase or exchange." *Id.* § 107(a)(3) (emphasis added). "Any lands acquired with funds" from the Trust "shall be held as Indian lands are held." *Id.* And, as with section 108, "[n]otwithstanding any other provision of law, the approval of the Secretary of any payment from the [Trust] shall not be required." *Id.* § 107(a)(6).

## II.

### A.

Sault describes itself as "economically distressed" and "severely land-starved." Compl. ¶¶ 18–19, ECF No. 1. Its current trust lands are all in Michigan's Upper Peninsula. A.R. 2154. These lands—consisting of 2,200 acres—serve the 15,000 members who live in that region. *Id.* Despite having no trust lands in Michigan's Lower Peninsula, about 14,000 of the Tribe's members live there. *Id.* According to the Tribe, federal policy in the twentieth century encouraged residents of the rural Upper Peninsula to relocate to urban areas in the Lower Peninsula. *Id.* at 2162–63. Once this failed "Voluntary Relocation Program" ended in 1975, many members could not afford to move back to the Upper Peninsula. *Id.* at 2163.

By 2012, the Tribe's situation was "increasingly tenuous." Compl. ¶ 33. It did not have enough land to serve its members in either the Upper or Lower Peninsula. *Id.* And its revenue from casinos in the "remote areas" of the Upper Peninsula had declined by 24.5 percent in the

past decade. *Id.* ¶ 34. This was because of "competition from the Michigan State Lottery and new casinos in the Lower Peninsula." *Id.*

To remedy these problems, the Tribe's board approved a plan to open a casino in the Lower Peninsula. *Id.* ¶ 35. The Tribe has been candid from the outset that its endgame here is to open a casino, if allowed under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.* A.R. 3112 n.1. Tribes can build casinos only on "Indian lands," 25 U.S.C. § 2710(d)(1), which include lands that the Government holds in trust for their benefit, *id.* § 2703(4)(B). As a first step toward a casino, then, the Tribe needed the Government to take land in the Lower Peninsula into trust. A simple property purchase by the Tribe would not suffice. The Tribe thus turned its attention to MILCSA, which requires the Secretary of the Interior to take into trust "[a]ny lands acquired using amounts from interest or other income of the Self-Sufficiency Fund." Pub. L. No. 105-143, § 108(f).

With an eye on MILCSA, the Tribe took steps to acquire a 71-acre plot of land in the Lower Peninsula—the "Sibley Parcel"—and asked the Secretary to take this parcel into trust. A.R. 3110, 3114.[2] It informed the Department that it would use income from the Self-Sufficiency Fund to purchase the parcel. *Id.* at 3114.[3] It also assured the Department that the purchase was a proper expenditure of Fund income. *Id.* at 3115.

Recall that § 108(c) of MILCSA specifies five purposes for which Fund income "shall be distributed." Pub. L. No. 105-143, § 108(c). In the Tribe's judgment, its use of Fund income to acquire the parcel was "for consolidation or enhancement of tribal lands," *id.* § 108(c)(5), and

---

[2] The Tribe also submitted a trust application for a 2.69-acre plot called the "Lansing Parcel." A.R. 2979, 2983. Sault's claims for the Lansing Parcel are now moot. *See* Order, ECF No. 71.

[3] When it submitted its trust application, the Tribe had a binding right to acquire the Sibley Parcel, and it has since acquired it. A.R. 3114, 3166.

"for educational, social welfare, health, cultural, or charitable purposes," *id.* § 108(c)(4). A.R. 3116–19. But—crucially—the Tribe claimed that its board had exclusive authority to decide that a distribution of Fund income was for one of these purposes, and thus the Secretary had no authority to conclude otherwise. *Id.* at 3115–16. The Secretary's only role under § 108(f) was to verify that the Tribe had purchased the land using Fund income. *See id.*

Still, the Tribe covered its bases. It advanced two reasons why the purchase was an "enhancement of tribal lands" under § 108(c)(5). The lead contention was that "enhance" means "augment," and acquisition of the parcel augmented its total landholdings "by increasing the total land [it] possessed." *Id.* at 3117. The Tribe acknowledged, however, that the Department had once given a different meaning to the term "enhancement" in section 107 of MILCSA. *Id.* The Department opined in 2010 that "enhancement" encompasses only those land purchases that increase the *value* of existing tribal landholdings. *See* Letter from Hilary C. Tompkins, Solicitor, U.S. Dep't of the Interior, to Michael Gross, Associate General Counsel, Bay Mills Indian Cmty. 4, 6 (Dec. 21, 2010) ("Bay Mills Opinion") (A.R. 457, 459).

The Tribe's alternative argument, then, was that the acquisition would increase the value of its existing landholdings. A.R. 3118. How so? It all came back to the casino it hoped to build. *See id.* A financial officer for Sault claimed the Tribe would use gaming revenue to "improve the value of [its] existing land holdings" by making improvements to existing casinos in the Upper Peninsula and funding more tribal services. *Id.* at 2215. The Director of the Tribal Housing Authority, meanwhile, asserted that "increased gaming revenue" was "the most viable means of increasing housing services availability." *Id.* at 2228. And the Tribe had passed resolutions requiring that it use some of the new gaming revenues to fund tribal services. *Id.* at 3094, 3150.

Along these lines, the Tribe also urged that its acquisition of the Sibley Parcel was "for educational, social welfare, health, cultural, or charitable purposes" under § 108(c)(4). *Id.* at 3119. It reasoned that extra gaming revenue would enable it to provide additional "social services" for its members in the Lower Peninsula. *Id.* More, the acquisition would generate a "land base" and employment opportunities for those members. *Id.*

**B.**

Sault submitted its trust application to the Department in June 2014. A.R. 3110. Over the next two and a half years, the Department periodically asked for more information and the Tribe duly supplemented the record. *Id.* at 812, 833–37, 2242–43, 2229–30. The back-and forth centered on two issues: (1) the source of the funds the Tribe used to acquire the parcel and (2) how the purchase would "enhance" tribal lands. *See id.* The Department also entertained opposition briefs from the State of Michigan, the NHBP, and the Saginaw Tribe. *Id.* at 180–217, 1482–83.

The Department eventually sent Sault an interim decision in January 2017. *Id.* at 969–74 ("January Letter"). In its view, the Tribe had to prove both that it acquired the land with Fund income *and* that the land acquisition complied with § 108(c). *Id.* at 971. And as matters stood, the Tribe's acquisition did not comply with § 108(c). *Id.* at 971 n.25, 974. It rejected the Tribe's argument that the acquisition "enhanced" tribal land by increasing the Tribe's total landholdings. *Id.* at 972. The Department reaffirmed its position from the Bay Mills Opinion that an "enhancement" encompasses only those land acquisitions that increase the value of existing landholdings. *Id.* at 972–73. In its judgment, the Tribe's evidence on that point was wanting.

*Id.* at 973.  The Department also dismissed the Tribe's contention that the land acquisition was "for educational, social welfare, health, cultural, or charitable purposes."  *Id.* at 972 n.25.[4]

The January Letter did not deny the Tribe's application outright.  Instead, the Department gave the Tribe another opportunity to present evidence that the land acquisition was an "enhancement of tribal lands."  *Id.* at 974.  The Tribe responded by asking for either a clarification of what additional evidence the Department required or a final decision denying the application.  *Id.* at 1889.  It never submitted additional evidence, *id.* at 1930 & n.4, and the Department issued a final decision denying the application in July 2017, *id.* at 1930–33 ("July Letter").

The July Letter reiterated the Department's earlier conclusions and elaborated on the "enhancement" issue.  *Id.* at 1931.  The Tribe had "not offered real estate appraisals or assessments . . . suggesting that the value of one tract of land would increase as a result of the acquisition of another."  *Id.* at 1932.  More, the Tribe had merely offered the "attenuated reasoning" that the acquisition might lead to greater gaming revenues, which it might *then* use to increase the value of existing land.  *Id.* at 1933.  Even if the Department could accept this reasoning, the Tribe had "not offered any evidence of its plans to use the gaming revenue to benefit its existing lands or its members."  *Id.*  Earlier in the letter, the Department noted that the Tribe's "conclusory statements" were "not evidence."  *Id.* at 1932 n.16.

In neither the January Letter nor the July Letter did the Department address whether the Tribe had acquired the parcel using Fund income.  There was no need to do so, in the

---

[4]  The Tribe had also urged that the acquisition was a "consolidation . . . of tribal lands."  A.R. 3117 n.3.  The Department rejected this argument, *id.* at 972 n.25, and the Tribe does not pursue it here, *see* Compl. ¶¶ 75–81.

Department's view, because the Tribe had failed to show compliance with § 108(c).  *Id.* at 974, 1932 n.15.

Next, the Tribe filed this suit.  It sought vacatur of the July Letter and an order compelling the Secretary to take the Sibley Parcel into trust.  Compl. ¶ 101(a), (e).  In the alternative, the Tribe sought vacatur and an order directing the Secretary to resolve, within 90 days, whether the Tribe acquired the parcel using Fund income.  *Id.* ¶¶ 100, 101(a), (e).

Shortly after the Department answered the Tribe's Complaint, the Casinos, the NHBP, and the Saginaw Tribe all moved to intervene as Defendants.  The Court granted these motions. *See* Order at 1,[5] ECF No. 36.  A flurry of cross-motions ensued.  Sault moved for summary judgment.  The Department and all Intervenors cross-moved for summary judgment.  These five motions are ripe, and the Court held a consolidated hearing on them all.

### III.

Summary judgment is normally appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  But this standard does not apply when a court is reviewing a decision by an administrative agency.  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006).  Instead, the Court reviews the agency's decision under the APA.  *See id.* at 89–90.

When a party challenges agency action under the APA, "the district judge sits as an appellate tribunal" and the "entire case on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (cleaned up).  The Court must "hold unlawful

---

[5] For documents not in the administrative record, all page citations are to the page numbers that the CM/ECF system generates.

and set aside" a decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

IV.

The Complaint lists three counts.  Between Counts I and II, Sault raises four arguments for vacatur of the Department's decision.  *First*, the Secretary had no authority to decide whether the Tribe's use of Fund income to acquire the Sibley Parcel complied with § 108(c) of MILCSA.  Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") at 26–33, ECF No. 43.  Section 108(f), in the Tribe's view, requires the Secretary to take land into trust on one—and only one—condition: that the Tribe acquired the land using Fund income, rather than some other source of funds.  *Id.* at 31–32.  *Second*, even if the Secretary had authority to verify compliance with § 108(c), its interpretation of "enhancement of tribal lands" was not permissible.  *Id.* at 33–48.  *Third*, in any event, the Tribe produced evidence that satisfied the Department's interpretation of "enhancement," and the Department acted arbitrarily and capriciously in ignoring that evidence.  *Id.* at 48–51.  *Fourth*, the Department wrongly concluded that the land acquisition was not "for educational, social welfare, health, cultural, or charitable purposes" under § 108(c)(4).  *Id.* at 52–53.

The Court agrees with the Tribe's first two arguments.  The Secretary has no authority to verify compliance with § 108(c) before taking land into trust under § 108(f).  In any event, the Department applied an impermissible interpretation of "enhancement of tribal lands."  Either ground alone warrants vacatur of the Department's decision.  *See* 5 U.S.C. § 706(2)(A).  The parties briefed and argued these issues in the most depth.  The Court therefore need not, and does not, address the merits of the Tribe's remaining arguments.

**A.**

The Department's decision was contrary to law because it misconstrued its authority under § 108(f) of MILCSA. The Department believed it had authority to verify (1) that the Tribe acquired the land using Fund income and (2) that the Tribe's use of Fund income to acquire the land was proper under the parameters of § 108(c). *See* A.R. 971. The Tribe insists the Department had authority to verify only the first—that it acquired the land using Fund income. Pl.'s Mot. at 31–32.

The text of § 108(f) bears out the Tribe's interpretation. "Any lands acquired using amounts from interest or other income of the Self-Sufficiency Fund shall be held in trust by the Secretary for the benefit of the tribe." Pub. L. No. 105-143, § 108(f). By its plain language, this provision imposes a mandatory duty on the Secretary to take land into trust on just one condition: that the Tribe acquired the land "using amounts from interest or other income" of the Fund. One condition means just one matter for the Secretary to scrutinize. Congress thus gave the Secretary no authority to scrutinize anything else, including whether Sault spent the income for a proper purpose under § 108(c).

The Department's contrary reading upends the remainder of section 108, which entrusts spending decisions to the Tribe. The Tribe's board of directors is the "trustee" of the Fund. *Id.* § 108(a)(2). A trustee typically decides how to manage the trust property, here, the Fund principal and income. *See* Restatement (Third) of Trusts § 70 (2007). Congress specified that the Tribe's board "shall administer the Fund in accordance with the provisions" of section 108. Pub. L. No. 105-143, § 108(a)(2). These "provisions" include § 108(c), which lists the purposes for which Fund income "shall be distributed." Thus, the purposes in § 108(c) are spending instructions for the Tribe, not the Secretary. So far, so clear.

But lest there was any doubt about the Secretary's role (or lack thereof):

> *Notwithstanding any other provision of law* . . . the approval of the Secretary for any payment or distribution from the principal *or income* of the Self-Sufficiency Fund *shall not be required* and the Secretary shall have *no trust responsibility* for the investment, administration, *or expenditure* of the principal *or income* of the Self-Sufficiency Fund.

*Id.* § 108(e)(2) (emphasis added). In stark terms, this provision strips the Secretary of any say over how the Tribe spends Fund income under § 108(c). Section 108(f), of course, counts as "any other provision of law" that § 108(e)(2) overrides. Yet the Department believes § 108(f) gives it authority to reject a land-to-trust application if it concludes that the land acquisition was an improper use of income under § 108(c). True, rejecting a trust application under § 108(f) is different from prohibiting the Tribe from spending the income in the first place. But this is a distinction without a difference. Either way, the Secretary is purporting to negate the board's use of Fund income.

Indeed, the Department and the Casinos—who strongly reject this reading of § 108(e)(2)—concede that the agency has no oversight role when the Tribe spends income for purposes other than land acquisition. *See* Mot. Hr'g Tr. at 31–32, 48–49. For example, if the Tribe chooses to distribute income "as an addition to the principal of the Fund," Pub. L. No. 105-143, § 108(c)(1), the Department cannot police whether this "addition" occurred. Matters are different, they insist, when the Tribe asks the Secretary to take land into trust. *See* Casinos' Mot. for Summ. J. ("Casinos' Mot.") at 17, ECF No. 45; Mot. Hr'g Tr. at 31–32, 48–49. When that happens, suddenly the Department can scrutinize the Tribe's use of income. If Congress had written the statute this way, that might have been sensible. Taking land into trust, after all, is no small matter.

But that is not the statute Congress wrote. Indeed, one might expect extra clarity if Congress intended the Department's role in reviewing expenditures to differ so dramatically as

between land acquisitions and otherwise. This distinction, however, is not at all apparent from § 108(f) or § 108(e)(2). If anything, the categorical language of § 108(e)(2) forecloses any distinction.

On the meaning of § 108(e), the Court finds some guidance in *Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250 (10th Cir. 2001). That case dealt with a law like MILCSA that Congress enacted for the benefit of the Wyandotte Tribe of Oklahoma. *See* Pub. L. No. 98-602, 98 Stat. 3149 (1984). The law allocated funds to the Wyandottes and provided that "$100,000 of such funds shall be used for the purchase of real property which shall be held in trust by the Secretary for the benefit of such Tribe." *Id.* § 105(b)(1).

The Wyandottes used these funds to purchase a tract of land. *Sac & Fox*, 240 F.3d at 1256. The question arose whether the Department had a mandatory duty to take this land into trust. *Id.* at 1261. The Department concluded that it did, but other tribes argued against a mandatory duty, citing the Indian Reorganization Act, which gives the Secretary general discretionary authority to acquire land in trust. *Id.* The court affirmed the Secretary's interpretation under the first step of *Chevron, U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984).[6] *See* 240 F.3d at 1262.

Insofar as § 105(b)(1) by itself was ambiguous, the Tenth Circuit found a different subsection "resolve[d] any potential ambiguities." *Id.* That other subsection mirrors § 108(e)(2) of MILCSA: "[N]othwithstanding any other provision of law, the approval of the Secretary for

---

[6] Under the *Chevron* two-step framework, a court first considers "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If the statute is unambiguous, that ends the analysis. *See id.* at 842–43. If the statute is "silent or ambiguous," the court goes on to step two and must uphold an agency's interpretation if it "is based on a permissible construction of the statute." *Id.* at 843.

any payment or distribution by the Wyandotte Tribe . . . of any funds described in subsection (b) . . . shall not be required[.]" Pub. L. 98-602, § 105(c)(1). According to *Sac & Fox*, this provision "clearly indicates that the Secretary shall have no discretion in deciding whether to take into trust a parcel of land purchased by the Wyandotte Tribe with Pub. L. 98-602 funds." 240 F.3d at 1262.

*Sac & Fox* thus undercuts the argument that § 108(e)(2) does not bear on the Secretary's authority under § 108(f). *See, e.g.*, Dep't Mot. for Summ. J. ("Dep't Mot.") at 21, ECF No. 53-1 ("[Sault's] reliance on § 108(e) . . . is . . . unconvincing because this provision concerns the scope of Interior's trust duties regarding the Fund and not land acquisition."). The Secretary's lack of say over how the Wyandottes distributed funds reinforced the Secretary's mandatory duty to take into trust lands that the tribe had acquired with those funds. *Sac & Fox*, 240 F.3d at 1262.

To be sure, *Sac & Fox* was addressing a different question than the one here. All agree, unlike in *Sac & Fox*, that the Secretary's trust duty under § 108(f) is mandatory. *See, e.g.*, Dep't Mot. at 11. The dispute is about what conditions trigger this mandatory duty. But similar logic applies. Under § 108(e)(2), the Secretary lacks a say over how Sault uses its income. This reinforces what is already apparent from § 108(f): the Secretary must take into trust land that the Tribe purchases with income, even if the Department thinks this use of income violated § 108(c).[7]

---

[7] The Casinos insist that under the Tribe's reading of § 108(e)(2), this provision would also strip the Department of any authority to second-guess whether the Tribe in fact used Fund income to acquire the land. Casinos' Reply at 7, ECF No. 60. Yet the Tribe concedes that the Department can question it on this point. *See* Pl.'s Mot. at 31–32. The Casinos' proposed analogy fails. The mandatory duty under § 108(f) applies only to "lands acquired using amounts from interest or other income." This provision says nothing about the purposes for which Sault acquired the land. Verifying whether the Tribe used income to acquire land does not give the Department a say over *how* the Tribe spends income, so § 108(e)(2) does not override the Department's authority to verify the sole precondition in § 108(f).

*Sac & Fox* is instructive for another reason. The court characterized the Indian Reorganization Act of 1934 as granting the Secretary "broad discretion . . . to decide whether to acquire land in trust on behalf of Indian tribes." 240 F.3d at 1261. Against this background of discretion, Congress imposed a mandatory trust duty in § 108(f). Yet allowing the Department to police compliance with § 108(c) would give it much discretion, particularly if the Court were to agree that the purposes in § 108(c) are susceptible to different interpretations. *See* Dep't Mot. at 27. The Department's interpretation thus transforms the mandatory duty in § 108(f) into something that looks much more like a discretionary power. This interpretation "inadequately accounts" for Congress's decision to use mandatory language in § 108(f). *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012).

In sum, section 108 creates a scheme with two basic parts. The first part is all about the Fund and the Tribe's role in administering the Fund. This part mentions the Secretary only twice. *See* Pub. L. No. 105-143, § 108(a)(1)(A), (e). It directs the Secretary to transfer Sault's share of judgment funds into the Self-Sufficiency Fund, *id.* § 108(a)(1)(A), (e)(1), and then divests the Secretary of any authority over how the Tribe administers the Fund, *id.* § 108(e)(2). Section 108(c), meanwhile, concerns (1) Fund income and (2) the purposes for which the Tribe can distribute this income.

If the Tribe uses income to acquire land, the Secretary's trust duty under § 108(f) comes into play. This is the second basic part of section 108, and it concerns the Secretary's role. In defining this role, Congress mentioned only one of the two components in § 108(c): use of Fund income. It did not mention anything about the purposes for which Sault used the income. The Secretary's role thus has nothing to do with this second component of § 108(c).

Yet the Department and Intervenors insist that § 108(f) gives the Secretary a role in policing the Tribe's compliance with this second component of § 108(c). Notably, few of their objections focus on the actual language of § 108(f). And those that attempt to do so end up relying on words that are absent from this provision. The Department insists, for example, that since the mandate in § 108(f) "applies only to *lands acquired pursuant to § 108(c)*, which in turn limits the purposes for which Fund income can be used," the Secretary must necessarily verify "that the use of Fund income satisfies a purpose in § 108(c)(1)–(5)." Dep't Mot. at 21–22 (emphasis added). In a similar vein, the Casinos urge that "just as the Secretary may concededly deny trust status if an acquisition was not funded with interest, he may, for the same reason, deny trust status because the acquisition was not funded through a *statutorily permissible use* of interest." Casinos' Mot. at 13.

There is simply no textual hook in § 108(f) for the authority that the Department claims. MILCSA does not define the Secretary's trust duty in terms of land "permissibly" acquired or land "acquired pursuant to § 108(c)." Congress knows how to define the Secretary's role in these terms when it wishes. Consider the wording of a different land-into-trust statute. *See* Gila Bend Indian Reservation Lands Replacement Act ("Gila Act"), Pub. L. No. 99-503, 100 Stat. 1798 (1986). The Gila Act authorizes a tribe "to acquire by purchase private lands in an amount not to exceed, in the aggregate, [9,880] acres." *Id.* § 6(c). And the Secretary, "at the request of the Tribe, shall hold in trust for the benefit of the Tribe any land which the Tribe acquires *pursuant to subsection (c) which meets the requirements of this subsection*." *Id.* § 6(d) (emphasis added). The "requirements" of subsection (d) ("this subsection") include that the land "constitutes not more than three separate areas consisting of contiguous tracts." *Id.*

Section 6(d) contains two sorts of clauses that Congress conspicuously did not include in § 108(f) of MILCSA: (1) "which the Tribe acquires pursuant to subsection (c)" and (2) "which meets the requirements of this subsection." If § 108(f) had directed the Secretary to take into trust "land acquired pursuant to § 108(c)," the Department would have a stronger argument for authority to verify compliance with § 108(c). After all, if the Tribe did not acquire the land for any of the purposes in § 108(c), it did not acquire the land "pursuant to" that subsection.[8] And the Department's argument would be even stronger if Congress had instructed the Secretary to take into trust "land whose acquisition meets the requirements of § 108(c)."[9]

In other words, Congress knows how to define the Secretary's trust duty in terms of a land acquisition that meets certain requirements—including the requirements of a separate subsection. But Congress did not say anything in § 108(f)—the subsection that defines the Secretary's role—about land acquisitions that meet the requirements of § 108(c). That is powerful evidence against the Department's interpretation. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (cleaned up)); *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1813 (2019) (applying *Russello*'s principle in a comparison of two different statutes).

---

[8] Just consider how the phrase "pursuant to" functions in the Gila Act. Section 6(c) authorizes the Tribe to purchase private lands in an amount not to exceed 9,880 acres. So the purchase of acre number 9,881 would not be "land which the Tribe acquires pursuant to subsection (c)." Pub. L. No. 99-503, § 6(d).

[9] Again, consider how the phrase "which meets the requirements of this subsection" functions in the Gila Act. "Land meets the requirements of this subsection only if it constitutes not more than three separate areas consisting of contiguous tracts[.]" Pub. L. No. 99-503, § 6(d). So if the Tribe acquired land consisting of four separate areas, the land would not meet subsection (d).

But, one Intervenor presses, if the Department has no role in policing compliance with § 108(c), the requirements in that subsection would be "wholly meaningless." Casinos' Mot. at 13. "There would have been no reason for Congress to allow the use of [income] only for *certain* purposes, if it intended to make trust status available for land purchased for *any* purpose." *Id.* To show the apparent absurdity of Sault's interpretation, the Casinos posit a hypothetical in which the Tribe shamelessly admits that it did *not* purchase land for any of the purposes in § 108(c), but still demands that the Department take the land into trust. *Id.* at 18.

Statutory requirements are not "wholly meaningless" simply because a federal agency has no power to enforce them. For one, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). So just because a statute imposes requirements, a federal agency does not automatically get to enforce those requirements. For example, the Civil Service Reform Act of 1978 imposed requirements on an Office of Special Counsel relating to investigations of alleged reprisals against whistleblowing. *Wren v. Merit Sys. Prot. Bd.*, 681 F.2d 867, 871–72 (D.C. Cir. 1982). But at the same time, the Merit Systems Protection Board had "no . . . authority to enforce these statutory requirements." *Id.* at 872. Congress has enacted other schemes that rely on self-policing. *See Contemporary Media, Inc. v. FCC*, 214 F.3d 187, 193 (D.C. Cir. 2000) ("The FCC relies heavily on the honesty and probity of its licensees in a regulatory system that is largely self-policing."). Indeed, the Casinos admit the Department has no authority to police compliance with the first three subparagraphs of § 108(c), yet they do not claim that these subparagraphs are "wholly meaningless." *See* Mot. Hr'g Tr. at 48–49.

Under Sault's interpretation, § 108(c) has meaning because it constrains how the *Tribe* chooses to spend Fund income. Section 108(a)(2) provides that the Tribe's board "shall

administer the Fund in accordance with the provisions of this section." So MILCSA envisions that the Tribe will adhere to the restrictions in § 108(c). Whether these restrictions are legally enforceable is separate from whether they have meaning. *See Wren*, 681 F.2d at 872 ("[I]f the [Office of Special Counsel] fails to perform its statutory duties, as here, relief—*if it lies at all*—must be sought in a separate action in the district court to compel the OSC to perform its statutory duties." (emphasis added)); *see also Nielsen v. Preap*, 139 S. Ct. 954, 983 (2019) (Breyer, J., dissenting) (describing the plurality's reliance on cases "holding certain statutory deadlines unenforceable," and citing these cases). The Court thus need not resolve whether and how § 108(c) is legally enforceable against the Tribe's board.[10] The Tribe ignores a "thou shalt" directive from Congress at its peril. The Department is not the only floorman on the job.

This understanding of § 108(c) as self-policing dovetails with principles of tribal sovereignty. Indian tribes are "domestic dependent nations that exercise inherent sovereign authority." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (cleaned up). A tribe's inherent sovereign authority encompasses "extensive powers over [its] property." *Cohen's Handbook of Federal Indian Law* § 4.01[2][c] (2019). And "courts will not lightly assume that Congress in fact intends to undermine Indian self-government." *Bay Mills*, 572 U.S. at 790. A scheme that gives the Department no role in policing how tribal property "shall be distributed" accords with tribal self-government.

---

[10] When pressed on enforcement mechanisms, Sault posited that tribal members likely would have a claim against the directors if, for example, they gave all the Fund income to themselves. Mot. Hr'g Tr. at 11–12. As Sault pointed out, the statute contains a provision that could allow tribal members to spot any self-dealing. Under this provision, the Fund's "books and records" are subject to an annual audit and any tribal member can inspect the audit report. Pub. L. No. 105-143, § 108(d)(2). The Department, for its part, questioned the ability of tribal members to enforce § 108(c), noting that MILCSA contains no waiver of sovereign immunity. Mot. Hr'g Tr. at 33. Sovereign immunity, though, would not to apply to individual tribal members or officials. *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014).

The Casinos' appeal to absurdity also falls short. They face "a high bar." *Stovic v. R.R. Ret. Bd.*, 826 F.3d 500, 505 (D.C. Cir. 2016). "The Supreme Court has equated an absurdity with an outcome so bizarre, illogical, or glaringly unjust that Congress could not plausibly have intended that outcome." *Id.* (cleaned up). The Casinos fail to clear this bar. MILCSA was a special provision for the benefit of select tribes, including Sault. The Tribe claims, and no party disputes, that this legislation represents "a negotiated compromise between sovereigns to remedy decades of failure by the federal government to compensate tribes for the nineteenth-century taking of their lands." Pl.'s Reply at 49, ECF No. 56.

The Indian Claims Commission had rendered judgments "in favor of the Sault [Tribe]" and other tribes. Pub. L. No. 105-143, § 102(a)(1). The Department had been holding on to the judgment funds "pending a division . . . among the beneficiaries in a manner acceptable to the tribes . . . and pending development of plans for the use and distribution of the respective tribes' share." *Id.* § 102(a)(2). That "division" and "development of plans" came in MILCSA. *See id.* § 102(b) ("It is the purpose of this title to provide for the fair and equitable division of the judgment funds among the beneficiaries and to provide the opportunity for the tribes to develop plans for the use and distribution of their share of the funds.").

MILCSA, then, is a restitution scheme, not a regulatory scheme, and one that Sault helped negotiate for itself. *See* Pl.'s Reply at 41, 49; Mot. Hr'g Tr. at 12–13. It returns to the Tribe its rightful funds. It provides no set of rules for the Tribe to follow and for the Secretary to enforce against the Tribe. Given all this, Sault's understanding of the statute is far from absurd. It is reasonable that the statute would leave it to the Tribe—and not the Department—to determine whether expenditures *of its own funds* fall within certain parameters. It is also sensible that the Tribe would negotiate an arrangement that assumes good faith on its part. This explains

the absolute phrasing of § 108(f)—the scheme trusts that any land the Tribe acquires using Fund income will be land that the Tribe acquires within the bounds of § 108(c).

The objections continue.  The Department and the NHBP lean heavily on a slight textual distinction between § 108(b) and § 108(c).  Subsection (b) states that Fund principal "shall be used exclusively for investments or expenditures *which the board of directors determines* . . . will consolidate or enhance tribal landholdings . . . ."  Pub. L. No. 105-143, § 108(b) (emphasis added).  Subsection (c), by contrast, directs that Fund income "shall be distributed . . . for consolidation or enhancement of tribal lands . . . ."  *Id.* § 108(c).  It does not use the phrase "which the board of directors determines."  The Department and Intervenors say this omission belies Sault's claim that its board has exclusive authority to determine compliance with § 108(c).  Dep't Mot. at 21; NHBP's Mot. for Summ. J. ("NHBP's Mot.") at 16–17, ECF No. 49.

The problem with this argument is three-fold.  *First*, whatever § 108(c) says, § 108(a)(2) entrusts spending decisions to the Tribe, as discussed above.  The Tribe's "board of directors" is the "trustee" of the Fund and "shall administer the Fund in accordance with the provisions" of section 108.  Pub. L. No. 105-143, § 108(a)(2).  These "provisions" include § 108(b) and § 108(c), which explain how Fund principal "shall be used" and how Fund income "shall be distributed."  So just through § 108(a)(2), the instructions in § 108(c) about how income "shall be distributed" are instructions for the Tribe.  And recall that the Department concedes that it has no authority to oversee distributions of income for the purposes in the first three subparagraphs of § 108(c).  Mot. Hr'g Tr. at 31–32.

*Second*, § 108(c) does not mention the Secretary either.  Indeed, as discussed, § 108(e) clarifies that the Secretary has no say over the Tribe's spending decisions.  So even if the Tribe

has non-exclusive authority to determine compliance with § 108(c), it is not the Secretary that shares this authority. Who might? Consider again the example of a tribal member suing the directors over an expenditure (assuming sovereign immunity would not bar suit, *see supra* note 10). If the member challenged an expenditure of principal, perhaps a court would defer to the board's determination that the expenditure falls within the parameters of § 108(b). But if the member challenged a use of income, a court might sensibly not defer to the board's assertion of compliance with § 108(c), given the slight textual contrast with § 108(b).

*Third*, the focus on § 108(b) versus § 108(c) deflects from the provision at issue, § 108(f). Section 108(f) calls for a single inquiry by the Secretary, whether the Tribe acquired the lands "using amounts from interest or other income" of the Fund. It does not invoke § 108(c) by saying, for example, "land acquired under § 108(c)" or "land acquired pursuant to § 108(c)." If it did, the distinction between § 108(b) and § 108(c) might be relevant.

The Tribe, presumably, would still contend that the Department cannot substitute its judgment, citing the provisions in MILCSA that entrust spending decisions to its board. But the Department could claim—with some force—that the lack of "which the board of directors determines" in § 108(c) means it does not have to take the Tribe's word that expenditures to acquire land were "under § 108(c)" or "pursuant to § 108(c)."

The Department next contends that the Court should read § 108(f) "in conjunction with Interior's general authority statutes," which give the Secretary of the Interior "responsibility over matters pertaining to Indian tribes." Dep't Mot. at 22. It cites three of these "general authority statutes." *Id.* One charges the Secretary "with the supervision of public business relating to . . . Indians." 43 U.S.C. § 1457(10). Another entrusts the "management of all Indian affairs" to the Commissioner of Indian Affairs, who works "under the direction of the Secretary." 25

U.S.C. § 2. And the third authorizes the President to "prescribe such regulations as he may think fit for carrying into effect the various provisions of any act relating to Indian affairs." 25 U.S.C. § 9.

The Department's reliance on these statutes proves too much. They do not give the Secretary power to do whatever he wants in matters of Indian affairs. This would contradict the many statutes, including MILCSA itself, that impose mandatory duties on the Secretary, *see* Pub. L. No. 105-143, § 108(e)(1), and prohibit him from taking certain actions, *see id.* § 108(e)(2). Here, the "[n]otwithstanding any other provision of law" clause in § 108(e)(2) explicitly overrides any authority the Secretary otherwise might have—including from generally applicable statutes—when it comes to policing how this Tribe spends its Fund income.

Even setting aside § 108(e)(2), the general authority statutes are exactly that—general. They merely prompt the question of what "management" of Indian affairs entails. Statutes like MILCSA fill in the details. So, under MILCSA, part of the Secretary's management role is to take into trust any lands the Tribe acquires using Fund income. *Id.* § 108(f). The question is what specific authority the Secretary has under § 108(f). It is circular to go back to the general statutes to determine the extent of this authority.

Apparently recognizing that its focus should be more granular, the Department insists that MILCSA is one of many "mandatory acquisition statutes" that require it to make "eligibility determinations" before taking land into trust. Dep't Reply at 9–10, ECF No. 62. It points to a section of the Indian Land Consolidation Act, *see* 25 U.S.C. § 2216(c), as an example. Dep't Reply at 9. A look at that statute, however, reveals a telling contrast with MILCSA, much like the contrast between MILCSA and the Gila Act, *see supra*:

> [A] . . . tribal government . . . in possession of an interest in trust or restricted lands, at least a portion of which is in trust or restricted status on November 7, 2000, and located

> within a reservation, may request that the interest be taken into trust by the Secretary. Upon such a request, the Secretary shall forthwith take such interest into trust.

25 U.S.C. § 2216(c). This structure noticeably differs from § 108(f). Before taking an interest into trust, the Secretary must verify that the tribe has made "such a request." And, under the first sentence, the tribe has not made "such a request" if, for instance, the interest is located outside a reservation. So the Secretary likely must verify, before exercising his mandatory trust duty, that the interest is "located within a reservation."

Section 108(f) of MILCSA would be comparable if it said something like this: "If the Tribe acquires land in conformity with § 108(c), it may request that the Secretary take the land into trust, and the Secretary, upon such a request, shall take the land into trust." Under this language, if the Tribe did not acquire land in conformity with § 108(c), an application to take that land into trust would not be "such a request," likely leaving the Secretary free to deny the application. But, of course, § 108(f) says nothing of the sort.

Consider also the Fallon Paiute Shoshone Indian Tribes Water Rights Settlement Act ("Fallon Act"), another statute that the Department cites. Dep't Mot. at 10; *see* Pub. L. No. 101-618, 104 Stat. 3289 (1990). It provides that the Fallon tribes may use income from a settlement fund for "[a]cquisition of lands, water rights or related property interests located outside the Reservation from willing sellers, and improvement of such lands." Pub. L. No. 101-618, § 102(C)(1)(e). And it instructs that "[t]itle to all lands, water rights and related property interests *acquired under section 102(C)(1)(e)* within the counties of Churchill and Lyon in the State of Nevada, shall be held in trust by the United States." *Id.* § 103(A) (emphasis added).

The difference between this language and § 108(f) of MILCSA is stark. If § 108(f) said "lands acquired under § 108(c)" instead of "land acquired using amounts from interest or other

income," the Department's claim of authority would be stronger. If the Tribe acquired land outside the parameters of § 108(c), it likely did not acquire it "under § 108(c)."

In short, the Department's citations to other "mandatory acquisition statutes" show simply that Congress phrases them in different ways. The differences between MILCSA and the Gila Act, the Indian Land Consolidation Act, and the Fallon Act are instructive, and they support Sault's interpretation of § 108(f).

Two additional objections run far afield of MILCSA, let alone § 108(f). The Casinos argue that "background principles of trust" support the Department's claim of authority. Casinos' Mot. at 15. Specifically, as a future trustee of the Tribe's land, the Secretary "is bound by basic fiduciary obligations—including, axiomatically, the foundational duty to ensure that the trust is administered in compliance with the law." *Id.* at 16. The Casinos cite no statutory authority for this obligation. *See id.* at 15–16; Casinos' Reply at 8–9, ECF No. 60. That is a problem for them, because the Government's fiduciary obligations to tribes are "defined and governed by statutes rather than the common law." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 174 (2011). The Casinos have no response to the Tribe's citation to *Jicarilla*. *See* Casinos' Reply at 8–9.

Even if the Department does have a general "background" obligation to administer the trust in compliance with the law, that just raises what "compliance with the law" entails. MILCSA gives the Tribe, but not the Secretary, authority to determine compliance with § 108(c)—*that* is the law. Thus, the Secretary violates no fiduciary obligation by following the letter of § 108(f).

Most creatively, the NHBP protests that under Sault's interpretation, § 108(f) would violate the Appointments Clause of the Constitution, art. II, § 2, cl. 2. NHBP's Mot. at 18–19.

How so?  Because § 108(f) would be "an unconstitutional congressional delegation to the Sault Tribe's board of directors of the function of taking land into trust."  *Id.* at 18.  This argument— which the NHBP did not pursue in its reply brief, *see* NHBP's Reply at 6–9, ECF No. 63—is unconvincing.  To start, it relies on the incorrect premise that the Tribe has "the function of taking land into trust."  All agree that § 108(f) delegates to the Secretary the duty to take land into trust.  The Tribe gets the ball rolling when it acquires land under § 108(c), but the trust duty still lies with the Secretary.  And all agree that § 108(f) requires the Secretary to verify that the Tribe in fact used Fund income.  The Secretary must therefore take a step in between the Tribe's acquisition of land and the final act of taking the land into trust.  The Tribe thus does not have "the function of taking land into trust."

The NHBP also fails to cite any clear authority supporting its constitutional argument.  The best it can muster is an out-of-circuit decision opining that a statute allowing "a state governor to have land taken in trust by the Federal Government" would "no doubt run afoul of the Appointments Clause."  *Confederated Tribes of Siletz Indians of Or. v. United States*, 110 F.3d 688, 698 (9th Cir. 1997).

But there is authority going the other way.  The Department of Justice's Office of Legal Counsel, relying on Supreme Court precedent, has long held that the Appointments Clause "simply is not implicated when significant authority is devolved upon non-federal actors."  *The Constitutional Separation of Powers Between the President and Congress*, 20 O.L.C. 124, 145 (1996) (citing *United States v. Hartwell*, 73 U.S. (6 Wall.) 385 (1868)).  Perhaps that is why the Department did not discuss the Appointments Clause either in its final agency decision or here.  And whatever the implications of the Appointments Clause for state actors, the Supreme Court

has upheld delegations of federal authority to Indian tribes. *See United States v. Mazurie*, 419 U.S. 544, 546 (1975).

As a last resort, the Department pleads for deference under *Chevron*. *See* Dep't Mot. at 23. The Tribe suggests that the *Chevron* framework does not apply to § 108(f). *See* Pl.'s Reply at 25. Why? Because Congress gave the Department a largely "ministerial" role in § 108(f). *See* Mot. Hr'g Tr. at 26–28. But that is the conclusion the Tribe wants the Court to reach on the meaning of § 108(f), so it is somewhat circular to cite this as why the *Chevron* framework does not apply at all. For their part, the Department and the Casinos invoke decisions that applied the *Chevron* framework to other land-into-trust statutes. *See, e.g.*, *Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell*, 830 F.3d 552, 558–59 (D.C. Cir. 2016).

Even if the *Chevron* framework applies to § 108(f), the Department does not get deference here. A court does not defer to an agency's interpretation of a statute if that interpretation contradicts the unambiguous terms of the statute. *See Chevron*, 467 U.S. at 842–43. And, for all the reasons given, § 108(f) is unambiguous—it grants the Department no authority to verify the Tribe's compliance with § 108(c).[11] More, § 108(f) is not "ambiguous" or "silent" under *Chevron* just because it does not affirmatively disavow the Department's authority on this score. *See Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) ("To suggest . . . that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power (*i.e.* when the statute is not written in 'thou shalt not' terms), is . . . flatly unfaithful to the principles of administrative law[.]").[12]

---

[11] These reasons include the Court's responses to the objections based on IGRA and Sault's gaming compact with Michigan. *See infra* Section IV.C.

[12] The Casinos suggest that the Tribe "waived" its "no-deference" argument "by failing to raise it in its Opening Brief." Casinos' Reply at 9 n.1. They are right that the Tribe's opening brief

More, even if § 108(f) is "ambiguous" or "silent" on whether the Department has authority to police the Tribe's compliance with § 108(c), the Department likely would still lose. When Congress enacts a statute for the benefit of a tribe, the Indian canon of construction trumps *Chevron* deference and requires that courts defer to the tribe's reasonable interpretation of any ambiguity. *See Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1445 & n.8 (D.C. Cir. 1988); *infra* Section IV.B. At a minimum, the Tribe's interpretation of § 108(f) is reasonable.

As we will see, the Indian canon permits an alternative holding for the proper interpretation of "enhancement of tribal lands" in § 108(c)(5). *See infra* Section IV.B. Having invoked the Indian canon for § 108(c)(5), the Tribe surprisingly failed to invoke it for § 108(f). *See* Pl.'s Mot. at 26–33; Pl.'s Reply at 16–32. But the Court sees no reason why the canon would not likewise permit an alternative holding for the § 108(f) issue: insofar as this provision is ambiguous, the Court should defer to the Tribe's reasonable interpretation of it. And under Sault's reasonable interpretation, the Department had no authority to deny the trust application on the ground that the Tribe did not acquire the Sibley Parcel for any purpose that appears in § 108(c).

## B.

In any event, the Tribe did acquire the Sibley Parcel for a purpose that appears in § 108(c): the "enhancement of tribal lands," Pub. L. No. 105-143, § 108(c)(5). The Department's contrary conclusion rested on an erroneous interpretation of this phrase. This is a separate and independently adequate reason for vacating the Department's decision.

---

omitted any mention of *Chevron* on the § 108(f) issue. *See* Pl.'s Mot. at 26–33. But the Tribe's argument was—and remains—that § 108(f) is unambiguous. *See id.* at 27–29. This is the same as saying that the Tribe wins under *Chevron*'s first step. *See Chevron*, 467 U.S. at 842–43. The Tribe had no need to address the entire *Chevron* framework until the Department claimed *Chevron* deference in its opening brief, which came after the Tribe's opening brief.

All agree that "enhancement of tribal lands" encompasses land acquisitions. The dispute is about what types of land acquisitions count. The Department says the phrase encompasses only those land acquisitions that "make greater" the value of the Tribe's existing landholdings. *See* Dep't Mot. at 25–27. The Tribe contends that the phrase reaches further, covering any land acquisitions "that increase the Tribe's total land base." Pl.'s Mot. at 33.

The Tribe is correct: "enhancement of tribal lands" unambiguously includes any land acquisition that increases the Tribe's total landholdings. The Department erred by concluding that this phrase encompasses only land acquisitions that increase the value of existing landholdings.

MILCSA does not define "enhancement," so the Court looks to the word's ordinary meaning. *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 454 (2012). The parties point to several dictionaries that define "enhance" in virtually identical ways. *See* Pl.'s Mot. at 33–34. Two are representative. The Department relies on a dictionary that defines "enhance" as "to make greater, as in cost, value, attractiveness, etc.; heighten; intensify; augment." Dep't Mot. at 27 (quoting *Webster's New Twentieth Century Unabridged Dictionary* (2d ed. 1979)). This is the definition the Department used in its Bay Mills Opinion, A.R. 457, and then adopted in its final decision here, *id.* at 1931. Sault, meanwhile, defines "enhance" as "[t]o make greater, as in value, beauty, or reputation; augment." *American Heritage Dictionary* 611 (3d ed. 1996). Other dictionaries agree. *See, e.g.*, *Webster's Second New International Dictionary* 849 (2d ed. 1950) ("To advance, augment, or elevate[;] To make greater, as in value or desirability.").

The import of these definitions is clear: "enhancement" means some sort of increase or augmentation; one *example* is an increase in value. The definitions are non-exhaustive—they

leave open the possibility of other types of increases. The question, then, is whether an increase in the size, number, or amount of something counts—in other words, a quantitative increase.

The answer is yes. Consider criminal sentencing, an area where courts often encounter variations on the word "enhance." In this context, Congress has used the phrase "enhanced punishment," 18 U.S.C. § 924(c)(1)(A), (c)(5), and the Supreme Court has referred to an "enhanced sentence," *Apprendi v. New Jersey*, 530 U.S. 466, 475 (2000). The word "enhancement" pervades the U.S. Sentencing Guidelines. In this context, everyone understands that an "enhancement" means a quantifiable increase in a criminal sentence.

The ordinary meaning of "enhancement," then, is an increase in size, amount, value, beauty, and any number of other quantitative and qualitative attributes. Plug this meaning into "enhancement of tribal lands." The result is a phrase that encompasses both "an increase in the value of tribal lands" and "an increase in the amount of tribal lands." A land acquisition that increases the amount of the Tribe's total landholdings accomplishes the latter, so it is an "enhancement of tribal lands."[13]

Context reinforces this conclusion. The whole point of MILCSA was to distribute judgment funds that the Indian Claims Commission had awarded to Sault and other tribes. *See* Pub. L. No. 105-143, § 102. Why had the Commission awarded Sault these funds? Because the Government took the land of Sault's ancestors for an unconscionably low sum. 26 Ind. Cl.

---

[13] The only other court to address the meaning of "enhancement" in MILCSA reached the same conclusion. In analyzing the meaning of "enhancement" in § 107(a)(3), the court reasoned: "Obviously, the purchase of the Vanderbilt Tract is an enhancement of tribal landholdings, as the additional land augmented, or made greater, the total land possessed by Bay Mills." *Michigan v. Bay Mills Indian Cmty.*, No. 1:10-cv-1273, 2011 WL 13186010, at *5 (W.D. Mich. Mar. 29, 2011). This was *dictum*, however, since the court ultimately determined that the purchase of the Vanderbilt Tract was not a "consolidation," and § 107(a)(3) requires both "consolidation and enhancement. *See id.* at *5–6. So the Court notes this case but does not lean heavily on it.

Comm. 550, 553, 561 (Dec. 29, 1971) (Docket Nos. 18-E and 58). MILCSA was compensation for a land grab. It makes sense, then, that Sault may use this compensation to expand its landholdings.

More still, the other term in § 108(c)(5)—"consolidation"—is about bringing together divided tracts, not expanding landholdings. The Department's implementing regulations for the Indian Reorganization Act permit the Secretary to take into trust land that is "within a tribal consolidation area." 25 C.F.R. § 151.3(a)(1); *see Sac & Fox*, 240 F.3d at 1261. One purpose of the Act was to remedy the failed policy of allotment, when the Federal Government carved reservation land into individually owned parcels. *See Cobell v. Kempthorne*, 532 F. Supp. 2d 37, 40–41 (D.D.C. 2008), *vacated on other grounds*, 573 F.3d 808 (D.C. Cir. 2009). When Congress enacted MILCSA, Sault's "existing tribal land base" was in the Upper Peninsula. NHBP's Mot. at 21. Yet Congress understood that Sault had members in the Lower Peninsula as well. *See* Pub. L. No. 105-143, § 102(a)(3)–(4). So it makes sense that Congress would have given the Tribe flexibility to buy new land in the Lower Peninsula, not just unite existing parcels in the Upper Peninsula.

Sault even got special treatment relative to other MILCSA tribes. Congress used the disjunctive for Sault: "consolidation *or* enhancement of tribal lands." *Id.* § 108(c)(5) (emphasis added). But Congress the conjunctive for the Bay Mills Community. "The earnings generated by the Land Trust shall be used exclusively for improvements on tribal land or the consolidation *and* enhancement of tribal landholdings through purchase or exchange." *Id.* § 107(a)(3) (emphasis added). The Court must "give[] effect" to this linguistic distinction. Scalia & Garner,

*supra*, at 174.[14]  If the use of "or" as opposed to "and" has any meaning, it must be easier for Sault to show a "consolidation or enhancement" than for Bay Mills to show a "consolidation and enhancement."

Here, a definition of "enhancement" that incorporates both a quantitative and qualitative component maximizes Sault's flexibility relative to Bay Mills.  Under that definition, if Bay Mills just acquires a new parcel, that is not enough—the acquisition must also "consolidate" tribal land.  The parties agree that a "consolidation" encompasses, at a minimum, uniting individual units into one mass.  *See* Pl.'s Mot. at 40 n.8; Dep't Reply at 13.  So Bay Mills must acquire a new parcel that unites two or more other plots.

But there's more.  Bay Mills must also prove that it acquired the new parcel as part of a transaction that increases the amount or value of the tribe's landholdings.  Bay Mills accomplishes this, of course, if the entire transaction is simply the purchase of the uniting parcel.  But if the transaction also involves selling a larger tract, that transaction would decrease, not increase, the size of its total land base, and the tribe would need to show an increase in land value.[15]

---

[14]  The Department acknowledged in the Bay Mills Opinion that it must presume the distinction between § 107(a)(3) and § 108(c)(5) "was intentional" and "makes a difference."  A.R. 459.

[15]  This reasoning shows why Intervenors are wrong to suggest that Sault's interpretation of "enhancement" makes "consolidation" superfluous.  They contend that any consolidation of land necessarily involves acquiring new land, which increases the Tribe's total landholdings.  *E.g.*, NHBP's Mot. at 23.  But the land exchange example illuminates how a consolidation can be part of an overall transaction that causes a net decrease.  The Casinos protest that a land exchange "would not implicate Fund interest."  Casinos' Mot. at 20.  Sault points out, however, that it could use Fund income "to pay unpaid debt or taxes on the purchased land."  Pl.'s Reply at 39.  This would be a use of Fund income as part of a transaction that consolidates tribal lands.  Intervenors also complain that the land exchange hypothetical is "hyper-specific" and "strained."  Casinos' Reply at 9 n.2; NHBP's Mot. at 23.  But land exchanges are not uncommon in Indian affairs—the Department's own regulations permit tribes to acquire land in trust "by exchange."  *See* 25 C.F.R. § 151.6.

Under § 108(c)(5), Sault does not have to worry about any of these details. If it engages in a land exchange that unites separate parcels, that is a "consolidation," and it need not worry about the quantitative or qualitative effect on its total land base. And if it simply purchases a new parcel, that parcel need not unite existing plots. In short, if we define "enhancement" to cover land acquisitions that increase the Tribe's total landholdings, Sault has maximum flexibility relative to Bay Mills—this honors Congress's choice to a tee.

Still, the Department and Intervenors try to show that MILCSA commands the Department's restrictive interpretation of "enhancement." Their efforts fail. They argue that Sault's interpretation renders the word "enhancement" itself superfluous. Dep't Mot. at 28–29; Casinos' Mot. at 19–20. The Casinos put it this way: "Under Sault's construction, *every* land acquisition would constitute an 'enhancement,' because every acquisition, by definition, would increase the size of the Tribe's real-estate portfolio." Casinos' Mot. at 19–20. The objection, then, seems to be that if Congress wanted the Tribe to spend income for any land acquisition, it would have said that, rather than use a more elaborate phrase like "enhancement of tribal lands."

This objection suffers at least two defects. *First*, it misunderstands Sault's interpretation of "enhancement." Sault is not saying that all land acquisitions qualify, just those that increase the size of the Tribe's total landholdings. *See* Pl.'s Mot. at 33, 40 n.8. That covers most land acquisitions, but not all. For example, if the Tribe acquired a small parcel in exchange for a larger parcel, that would decrease the size of tribal landholdings. And if the new parcel did not unite two or more other parcels, that would not be a consolidation either. So it is incorrect to think that Congress could have achieved the same meaning by saying Fund income "shall be distributed . . . for land acquisitions."

*Second*, even if "enhancement" covers any land acquisition, that does not make this word superfluous—it just means Congress was inartful. So long as "enhancement of tribal lands" and "land acquisitions" have the same meaning, it does not matter that one phrase is clunkier than the other. *Cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) ("[A] court cannot wave the ambiguity flag just because it found the regulation impenetrable on first read.").[16]

The Casinos ultimately try to shift focus onto the phrase "tribal lands": "the real question is not whether 'enhancement' denotes qualitative or quantitative increases, but whether 'tribal lands' denotes tribal property *at the time of* or *after* the enhancement." Casinos' Reply at 10. In their view, "Congress was clearly requiring an impact on *existing* lands owned by the Tribe." Casinos' Mot. at 20. The Casinos fail to explain, though, why this understanding of "tribal lands" commands the Department's restrictive definition of "enhancement." Just substitute Sault's definition of enhancement into § 108(c)(5): "for consolidation or [increase in the amount of or increase in the value of] [existing] tribal lands." There is nothing amiss about that phrasing.

Even if we think in terms of the Casinos' word "impact"—a word that does not appear in § 108(c)(5)—an increase in the amount of tribal land does "impact" "existing lands." It impacts them by adding to them. Think of an enhancement of a criminal sentence. The enhancement impacts the "existing" sentencing range by adding to it.

---

[16] A possible third reason this objection fails is that "enhancement of tribal lands" could encompass more than just land acquisitions, such as improvements that increase the value of tribal land. The Court is mindful that § 107(a)(3) uses the phrase "improvements on tribal land" while § 108(c)(5) does not, but "enhancement" could still fairly encompass improvements *not* on tribal lands. For example, the Tribe might help fund a private or governmental project adjacent to tribal land that increases the land's value. This understanding of "enhancement" fits with the theme of Congress giving Sault maximum flexibility.

Doubling down, the NHBP claims that § 108(c)(5) is about consolidating and enhancing lands in the Upper Peninsula only. MILCSA's focus, it insists, was on "strengthening the Sault Tribe's existing tribal land base in 1997 *where it was*, not on further fragmenting its trust lands for business ventures." NHBP's Mot. at 21. For that reason, the NHBP urges the Court to interpret "enhancement" as a "close correlate to consolidation," which would limit the places where Sault could buy land. *See id.* at 22.

This objection founders for several reasons. First, interpreting "enhancement" as a "close correlate" to "consolidation" reduces the daylight between those terms. That would in turn reduce the daylight between "consolidation *and* enhancement" in § 107(a)(3) and "consolidation *or* enhancement" in § 108(c)(5), which undermines the greater flexibility that Congress gave Sault.

More, the NHBP's proposed geographic restriction appears nowhere in § 108(c)(5). Indeed, textual evidence cuts against any geographic restriction. Congress found that the Chippewa Indians, the ancestors of the Sault Tribe, used sites in "both" the Upper and Lower Peninsulas. *See* Pub. L. No. 105-143, § 102(a)(3)–(4). It recognized that the Chippewa had "intermarried" with the Ottawa Indians, who had land in the Lower Peninsula, "and there were villages composed of members of both tribes." *Id.* Given these findings, Congress certainly could have used language expansive enough to allow Sault to buy land in the Lower Peninsula.

Finally, Congress has included geographic restrictions in other statutes governing acquisition of lands. *See, e.g.*, Seneca Nation Settlement Act, Pub. L. No. 101-503, § 8(c), 104 Stat. 1292 (1990) (authorizing the Seneca Nation to acquire land "within its aboriginal area in the State or situated within or near proximity to former reservation land"). Congress therefore

"knows how to impose such a requirement when it wishes to do so." *Whitfield v. United States*, 543 U.S. 209, 216 (2005).

For all these reasons, "enhancement of tribal lands" is unambiguous—it encompasses land acquisitions that increase the Tribe's total landholdings.[17] The statute thus forecloses the Department's attempt to cabin "enhancement" to land acquisitions that increase the value of tribal lands. Having applied an impermissible interpretation of "enhancement," the Department's final decision was contrary to law. This conclusion is enough to justify vacatur.

The Department protests that at the very least, "enhancement of tribal lands" is ambiguous, and so it should receive deference under the second step of *Chevron*. *See* Dep't Mot. at 25–31. This claim of house advantage suffers from two flaws. First, it misunderstands ambiguity. Second, the *Chevron* framework does not apply at all—if § 108(c)(5) is ambiguous, the Indian canon requires that the Court defer to the *Tribe's* reasonable interpretation of this provision.

The Department's argument for ambiguity goes something like this: if "enhancement" covers several meanings, that creates ambiguity and the Department reasonably chose *one* of the meanings to the exclusion of the others. *See id.* at 27. This confuses breadth with ambiguity. They are not the same. *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998). The Department and Intervenors do not seriously dispute that the ordinary meaning of "enhancement" encompasses *both* increases in amount and increases in value (and increases in several other types of attributes). *See* Dep't Mot. at 27; Casinos' Mot. at 19. So if we encounter "enhancement" in a vacuum, we must take as a starting point that the word refers to all its

---

[17] These reasons include the Court's responses to the objections based on IGRA and Sault's gaming compact with Michigan. *See infra* Section IV.C.

meanings simultaneously.  For example, if all we see is the phrase "enhancement of food," we must assume, until knowing more, that this phrase refers both to an increase in the quality of food and an increase in the amount of food.  Once we know more about the surrounding context and apply the "traditional tools of statutory construction," *Chevron*, 467 U.S. at 843 n.9, it may become apparent that the phrase refers only to one of the options.  Or the ambiguity may persist.

So too here.  The only difference is that we do know the context that surrounds "enhancement of tribal lands" and have considered how the "traditional tools of statutory construction" bear on its meaning.  For the reasons discussed, the Department and Intervenors fail to show ambiguity on whether the phrase refers to (1) increases in land amount *and* increases in land value versus (2) *only* increases in land value.

*Arizona v. Tohono O'odham Nation*, 818 F.3d 549 (9th Cir. 2016), is instructive.  That case dealt with the meaning of "land claim" in IGRA, 25 U.S.C. § 2719(b)(1)(B)(i).  *See* 818 F.3d at 556.  Citing a dictionary definition, the court observed that the phrase "has a broad, general meaning."  *Id.* at 557.  A "land claim" could be "a claim for impairment to title of land" or "a claim for damage to land."  *Id.*  But, the Ninth Circuit stressed, "a word or phrase is not ambiguous just because it has a broad general meaning."  *Id.*  The court found that "land claim" was unambiguous—"a claim for impairment to title of land, a claim for dispossession of land, and a claim for damages to land *would all be encompassed by it*."  *Id.* (emphasis added) (citing Scalia & Garner, *supra*, at 101 ("Without some indication to the contrary, general words . . . are to be accorded their full and fair scope.")).  The same reasoning applies here.

In any event, *Chevron* would not save the Department even if it could show that "enhancement of tribal lands" is ambiguous.  The Indian canon of construction provides that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions

interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). The Court's choice between "two possible constructions . . . must be dictated by [this] principle." *County of Yakima v. Yakima Indian Nation*, 502 U.S. 251, 269 (1992). In *Yakima*, the tribe's proposed interpretation was "eminently reasonable," so the Supreme Court was "require[d] . . . to apply that interpretation for the benefit of the Tribe." *Id.* Along these lines, the D.C. Circuit has held that if a statute "can reasonably be construed as the Tribe would have it construed, it *must* be construed that way." *Muscogee*, 851 F.2d at 1445. It was "for this reason" that the court gave "careful consideration" to Interior's interpretation of the statute, but "d[id] not defer to it." *Id.* 1445 n.8.

The D.C. Circuit has since reaffirmed this interaction between the Indian canon and the *Chevron* framework. *See, e.g.*, *Cobell v. Norton* ("*Cobell VI*"), 240 F.3d 1081, 1101 (D.C. Cir. 2001). In *Cobell VI*, the court held that even if the statute at issue were ambiguous, *Chevron* deference would be "not applicable" because the Indian canon was the "governing canon of construction." *Id.* "Therefore, even where the ambiguous statute is one entrusted to an agency, we give the agency's interpretation careful consideration but we do not defer to it." *Id.* (cleaned up). So too here. Having given "careful consideration" to the Department's interpretation of "enhancement of tribal lands," the Court still concludes, for all the reasons given, that Sault's interpretation is reasonable at a minimum.[18] Thus, the Court must interpret § 108(c)(5) according to Sault's interpretation, even if the statute is ambiguous. *Muscogee*, 851 F.2d at 1445.

---

[18] These reasons include the Court's responses to the objections based on IGRA and Sault's gaming compact with Michigan. *See infra* Section IV.C.

The Department and Intervenors raise two objections to this alternative holding. Neither succeeds. *First*, the Department cites *Cobell v. Salazar* ("*Cobell XXII*"), 573 F.3d 808 (D.C. Cir. 2009), which said that "*Chevron* deference does not disappear from the process of reviewing an agency's interpretation of those statutes it is trusted to administer for the benefit of the Indians, although that deference applies with muted effect." *Id.* at 812. This means, in the Department's view, that "an agency's legal authority to interpret a statute appears to trump any practice of construing ambiguous statutory provisions in favor of Indians." Dep't Mot. at 31 (quoting *Rancheria v. Jewell*, 776 F.3d 706, 713 (9th Cir. 2015)).

Whatever "muted effect" means, it is different from saying that *Chevron* "trumps" the Indian canon. Indeed, right before the "muted effect" sentence, *Cobell XXII* observed that "*Chevron* deference can be trumped by the requirement that statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." 573 F.3d at 812 (cleaned up). So the question becomes how to reconcile *Cobell XXII* with earlier Indian cases declaring that "*Chevron* deference is not applicable," *Cobell VI*, 240 F.3d at 1101, and that a statute "*must* be construed" according to a tribe's interpretation if that interpretation is reasonable, *Muscogee*, 851 F.2d at 1445.

On this, the case law is scarce. In the eleven years since *Cobell XXII*, the D.C. Circuit has not explained what "muted *Chevron* deference" entails. And only one other judge in this District has referenced this language. *See Koi Nation of N. Cal. v. U.S. Dep't of the Interior*, 361 F. Supp. 3d 14, 48–49 (D.D.C. 2019). As Chief Judge Howell saw it, the "muted effect" sentence in *Cobell v. XXII* "clarified" *Muscogee*'s statement that a court "*must*" defer to a tribe's reasonable interpretation while still giving "careful consideration" to an agency's interpretation. *See id.* at 48.

This essentially reflects the Court's thinking. The most sensible way to reconcile *Cobell XXII*, *Muscogee*, and other decisions in between is to say that "muted *Chevron* deference" requires the Court to give the Department's interpretation "careful consideration." *Cf. Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (holding that agency interpretations "not controlling upon the courts by reason of their authority" are still "entitled to respect" insofar as they have "power to persuade"). This "careful consideration" of an agency's construction may reveal that a tribe's interpretation is unreasonable, overcoming the Indian canon. But the Tribe's interpretation of § 108(c)(5) is reasonable, so the Indian canon "trump[s]" *Chevron* deference here. *Cobell XXII*, 573 F.3d at 812.

*Second*, the Department and Intervenors urge that deference to Sault is inappropriate because its interpretation of "enhancement" would harm the interests of the NHBP and the Saginaw Tribe. *See* Dep't Mot. at 30–31; Saginaw's Mot. for Summ. J. ("Saginaw's Mot.") at 9, ECF No. 51. They rely on out-of-circuit precedent holding that the Indian canon does not apply when "all tribal interests are not aligned." *Rancheria*, 776 F.3d at 713. They cite no D.C. Circuit cases that have adopted this exception to the Indian canon, nor has the Court found any. But other judges in this District have done so, citing Ninth Circuit case law. *See Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 279, 314 (D.D.C. 2018).

In any event, this exception to the Indian canon does not apply here. All but one of the cases the Department and Intervenors cite for this exception dealt with statutes that benefit all Indians generally, such as IGRA. *See, e.g.*, *id.* The other case involved a treaty, and the tribe with countervailing interests was a signatory to—and beneficiary of—the treaty. *See Confederated Tribes of Chehalis Indian Reservation v. Washington*, 96 F.3d 334, 338, 340 (9th Cir. 1996). Congress enacted MILCSA for the benefit of select tribes—the NHBP and the

Saginaw Tribe are not among them. *See* Pub. L. No. 105-143, §§ 102, 104. Indeed, the section at issue, § 108, is for the benefit of only one tribe—the Sault Tribe. *See id.* § 108(a)(1). The Department and Intervenors have cited no cases applying the "not all tribal interests aligned" exception in an analogous circumstance. That is unsurprising. It would be strange to construe a statute against the only Tribe it seeks to benefit simply because another Indian tribe objects.

## C.

Consider next two additional objections the Intervenors raise on both the § 108(f) issue and the § 108(c)(5) issue. Both objections—which concern IGRA and Sault's 1993 gaming compact with Michigan—fall short.

All three Intervenors vigorously contend that Sault's interpretation of MILCSA would upset the regulatory framework in IGRA. Sault has been frank that it hopes to build a casino on the Sibley Parcel; a casino would count as Class III gaming under IGRA. *See Bay Mills*, 572 U.S. at 785. The Intervenors point out that an Indian tribe can conduct Class III gaming only on "Indian lands." 25 U.S.C. § 2710(d)(1). "Indian lands" include "any lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe." *Id.* § 2703(4)(B). Thus Sault's attempt to invoke § 108(f) of MILCSA and get the Secretary to take the Sibley Parcel into trust.

What, though, does IGRA have to do with the Court's interpretation of MILCSA? Everything, the Intervenors insist. If the Court accepts Sault's interpretation of either § 108(f) or § 108(c)(5), the Secretary would have to take virtually any land Sault acquires into trust. *E.g.*, Saginaw's Mot. at 18. That would, in turn, give Sault "alone among tribes, unfettered ability to locate an unlimited number of casinos anywhere in the country." NHBP's Mot. at 24. This is no good, the Intervenors say, because IGRA embodies a "federal policy . . . against the proliferation

of off-reservation gaming." *Id.* They cite several provisions in IGRA that restrict off-reservation gaming. Saginaw's Mot. at 12–15.

But these very restrictions cut against the Intervenors' parade of horribles. To start, IGRA generally prohibits gaming "on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988." 25 U.S.C. § 2719(a). If the Secretary ever takes the Sibley Parcel into trust, this will of course occur after 1988. To get around the general prohibition, Sault would need to satisfy one of several exceptions. One of these exceptions is for lands "taken into trust as part of . . . a settlement of a land claim." *Id.* § 2719(b)(1)(B)(i). Sault believes the Sibley Parcel would satisfy this exception if the Secretary takes it into trust under § 108(f). A.R. 452–53. But one Intervenor goes out of its way to argue that any land Sault acquires under MILCSA would *not* satisfy this exception. *See* NHBP's Mot. at 26. If the NHBP is right, MILCSA would not, as it claims earlier in its brief, give Sault "unfettered ability to locate an unlimited number of casinos anywhere in the country." *Id.* at 24. The NHBP cannot have it both ways.

In any event, the meaning of the "settlement of a land claim" exception is a question for another day—the point is that Sault still has some work to do. This case is not Sault's last stop on its quest for a casino, as several parties conceded at oral argument. Mot. Hr'g Tr. at 6–7 (Sault), 34 (Department), 46 (Casinos), 61 (Saginaw Tribe).

IGRA places yet more restrictions on Class III gaming. Sault's board of directors must pass "an ordinance or resolution" that meets many requirements and receives approval from the Chairman of the National Indian Gaming Commission. 25 U.S.C. § 2710(d)(1)(A). Sault must also conduct its gaming activities "in conformance with a Tribal-State compact entered into by the Indian tribe and the State." *Id.* § 2710(d)(1)(C). This proviso cripples the Casinos'

suggestion that Sault could launch casinos in far-flung states like Florida. Mot. Hr'g Tr. at 43. Sault does have a gaming compact with Michigan, but as we will soon see, two Intervenors believe that Sault's trust application *violates* this compact. Again, Sault still has some obstacles to overcome before it gets to rake in the chips.

It is also not so absurd to think that Congress intended MILCSA to expand Sault's casino opportunities. Consider the special treatment that Sault received relative to Bay Mills. A conspicuous difference between § 107(a)(3) and § 108(f) is that lands Bay Mills acquires with its trust funds "shall be held as Indian lands are held," a more generic phrase than "shall be held in trust by the Secretary." It is not settled whether lands "held as Indian lands are held" are "Indian lands" under IGRA. The Department concluded a decade ago in its Bay Mills Opinion that they were not, A.R. 460, but the ensuing litigation never resolved that question, *see Bay Mills*, 572 U.S. at 786–87.

By contrast, no one disputes that lands "held in trust" are "Indian lands" under IGRA. 25 U.S.C. § 2703(4)(B). "Congress must be presumed to have known of its former legislation." *St. Louis, I.M. & S. Ry. Co. v. United States*, 251 U.S. 198, 207 (1920). So, in passing MILCSA, Congress knew that it was giving Sault the tools to acquire "Indian lands" under IGRA. Congress was also aware of the "settlement of a land claim" exception that allows certain land acquired in trust after 1988 to be gaming-eligible. *See* 25 U.S.C. § 2719(a), (b)(1)(B)(i). Yet it still gave Sault a land-into-trust provision in a statute called the "Michigan Indian Land Claims Settlement Act." To be clear, the Court takes no view on the applicability of the exception. The point is that it is not so "bizarre" or "illogical" that Congress intended for Sault to circumvent some of IGRA's limitations. *Stovic*, 826 F.3d at 505.

The Intervenors insist on a narrow interpretation of § 108(f) and § 108(c)(5) because Congress would not have wanted to give Sault "unfettered ability" to build as many casinos as it wants, wherever it wants. NHBP's Mot. at 24. But they ignore the many legal and practical limitations on how much land Sault can acquire with Fund income. The full phrase is "interest and other investment income." Pub. L. No. 105-143, § 108(c). So the amount of "Fund income" Sault can spend on casino-building will depend on the success of its investments. And, of course, Sault will always have finite income.

The NHBP complains that Sault will just pour the new casino revenues into its Fund, generating enough income for the next casino project, and so on. *See* Mot. Hr'g Tr. at 72–73. But § 108(c) spells out several other purposes for which Sault can spend Fund income, including "as a dividend to tribal members" and "as a per capita payment to some group or category of tribal members." Pub. L. No. 105-143, § 108(c)(2)–(3). One might expect tribal dissent if Sault's board ignored these other uses of Fund income and focused only on building casinos in far-flung lands. Political accountability within the Tribe thus provides another check.

One final point on the IGRA objection—taking land into trust is not significant only for its gaming benefits, as one Intervenor concedes. Mot. Hr'g Tr. at 65. According to the Bureau of Indian Affairs, "many federal programs and services are available only on reservations or trust lands."[19] For example, "trust acquisitions provide tribes the ability to enhance housing opportunities for their citizens."[20] Congress thus had other reasons to give Sault generous treatment through § 108(f) and § 108(c)(5). And it could have reasonably expected that the legal

---

[19] U.S. Dep't of the Interior, Bureau of Indian Affairs, *Fee to Trust*, bia.gov/bia/ots/fee-to-trust (last visited Feb. 20, 2020).

[20] *Id.*

and practical limitations on Sault's gaming would keep *that* pursuit in check. For all these reasons, the Intervenors have failed to show that Sault's interpretation of § 108(f) and § 108(c)(5) makes "nonsense" of IGRA, let alone violates anything in that statute. *Id.* at 55–56.

The Intervenors also claim that Sault's trust application violated its 1993 gaming compact with Michigan (the "Compact"). Section 9 of the Compact states:

> An application to take land in trust for gaming purposes pursuant to § 20 of IGRA (25 U.S.C. § 2719) shall not be submitted to the Secretary of the Interior in the absence of a prior written agreement between the Tribe and the State's other federally recognized Indian Tribes that provides for each of the other Tribes to share in the revenue of the off-reservation gaming facility that is the subject of the § 20 application.

A.R. 3224. The Intervenors believe that Sault has violated Section 9 because it failed to secure revenue-sharing agreements with the NHBP and the Saginaw Tribe before submitting its trust application to the Secretary. NHBP's Mot. at 25; Saginaw's Mot. at 17. On this basis, they conclude that Sault's trust application is invalid. NHBP's Mot. at 25; Saginaw's Mot. at 16–17.

Whatever the merits of this argument, it is irrelevant to this case. The Court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 135 S. Ct. 2699, 2710 (2015). The Department's basis for denying Sault's trust application was the Tribe's failure to meet the requirements of MILCSA; its decision did not mention the Compact. *See* A.R. 969–74, 1930–33. Intervenors are just offering an alternative reason to uphold the Department's denial—that Sault's application was invalid under the Compact because it did not first secure revenue-sharing agreements. This has nothing to do with an interpretation of MILCSA. Section 108 does not say anything about requiring Sault to comply with its gaming compacts or to secure revenue-sharing agreements.

This litigation is simply not the appropriate time to decide the meaning of the Compact. That time may well come. As Sault points out, the State of Michigan—not a party to this

action—sought to enjoin Sault from submitting its trust application in the first place, based on the Tribe's alleged failure to secure revenue-sharing agreements.  *See Michigan v. Sault Ste. Marie Tribe of Chippewa Indians*, 737 F.3d 1075, 1076 (6th Cir. 2013).  The district court there lacked jurisdiction because it was a suit to enjoin a trust submission under MILCSA, not a class III gaming activity, and so the Tribe had sovereign immunity.  *See id.*  The Sixth Circuit emphasized, however, that its decision did "not affect the legal viability of a later suit to enjoin, as a violation of . . . § 9 of the Compact . . . *class III gaming* on the land taken into trust."  *Id.* at 1080.  Sault thus concedes that the State of Michigan, at least, can "renew[] its previous claim that the Tribe breached § 9 [of the Compact]."  Pl.'s Reply at 58.[21]

*     *     *

On these issues of statutory interpretation, the objections of the Department and Intervenors exhibit a recurring theme: Congress could not have possibly intended the meaning that Sault assigns to § 108(f) and § 108(c)(5).  This argument does not wash.  The Court "has no roving license . . . to disregard clear language simply on the view that . . . Congress 'must have intended' something [different]."  *Bay Mills*, 572 U.S. at 794.  If the Department and Intervenors find this law to be "a ass—a idiot," that is a matter to address to Congress, not the courts.  *See A.M. v. Holmes*, 830 F.3d 1123, 1170 (10th Cir. 2016) (Gorsuch, J., dissenting) ("Often enough the law can be 'a ass—a idiot'—and there is little we judges can do about it, for it is (and should be) emphatically our job to apply, not rewrite, the law enacted by the people's representatives." (citation omitted)).

---

[21]  The NHBP and the Saginaw Tribe may be able to bring this claim as well.  *See* 25 U.S.C. § 2710(d)(7)(A)(ii).

## V.

Since the Department's decision was "not in accordance with law," the Court will vacate

it. 5 U.S.C. § 706(2)(A). The normal remedy accompanying vacatur is a remand to the agency

for further proceedings. *See N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir.

2012). But Sault asks for more. *See* Compl. ¶¶ 92–100 (Count III). It asks the Court to order

the Secretary to take the Sibley Parcel into trust. Pl.'s Mot. at 53. Failing that, Sault wants an

order requiring the Secretary to decide within 90 days of remand whether the Tribe did in fact

acquire the Sibley Parcel with Fund income. In support of these requests, Sault invokes the

mandamus statute, 28 U.S.C. § 1361, and the APA's directive that "[t]he reviewing court

shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C.

§ 706(1).

To begin, Sault's request for a writ of mandamus under § 1361 is, at a minimum,

redundant. *See Mt. Emmons Mining Co. v. Babbitt*, 117 F.3d 1167, 1170 (10th Cir. 1997) ("The

availability of a remedy under the APA technically precludes Mt. Emmons' alternative request

for a writ of mandamus . . . although the mandatory injunction is essentially in the nature of

mandamus relief[.]" (citation omitted)). Sault concedes as much. It asserts that "'[b]oth

mandamus and injunctive relief [under § 706(1)] are available' to remedy an agency's

'dereliction in discharging a mandatory duty.'" Pl.'s Mot. at 54 n.9 (second alteration in

original) (quoting *Carpet, Linoleum & Resilient Tile Layers, Local Union No. 419 v. Brown*, 656

F.2d 564, 567 (10th Cir. 1981)). More, it views the "substantive requirements" for mandamus

relief and relief under § 706(1) as "the same." *Id.* (citing *Carpet*, 656 F.2d at 567). It cites a

D.C. Circuit decision that apparently supports this proposition. *See Potomac Elec. Power Co. v.*

*ICC*, 702 F.2d 1026, 1034 (D.C. Cir. 1983) ("The power grounded in 5 U.S.C. § 706(1) to compel agency action can also be effectuated through the use of a writ of mandamus.").

Ultimately, Sault claims that it needs to establish two elements to get its desired relief: that the agency (1) had a clear duty to act and (2) unreasonably delayed in discharging that duty. Pl.'s Mot. at 54 (citing *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004) (addressing what a party needs to show when it seeks a writ of mandamus for unreasonable delay under 5 U.S.C. § 706(1))). The Court follows this lead but concludes that Sault has not shown both elements. It is thus not entitled to the extraordinary relief it seeks.

On the first element, Sault contends that the Secretary has a clear duty under § 108(f) to take the Sibley Parcel into trust. *Id.* On its (correct) view of § 108(f), the Secretary has a mandatory duty to take the parcel into trust contingent on whether the Tribe in fact acquired the parcel with Fund income. *Id.* The Secretary thus has a clear duty to take the parcel into trust if—and only if—the Tribe acquired the parcel with Fund income. But this income issue remains unresolved. So as matters stand, the Secretary does not have a clear duty to take the parcel into trust.

*Sierra Club v. Thomas*, 828 F.2d 783 (D.C. Cir. 1987), is not to the contrary. The court there opined that "[e]xamples of such clear duties to act include provisions that require an agency to take specific action when certain preconditions have been met." *Id.* at 793. Sault posits that § 108(f) is precisely this sort of provision. Pl.'s Mot. at 54–55. The key words, though, are "when certain preconditions have been met." Indeed, *Sierra Club* itself merely cited a decision holding "that statutory preconditions *had been satisfied* so as to compel specific agency action." 828 F.2d at 793 n.70 (emphasis added) (citing *EDF, Inc. v. Ruckelshaus*, 439 F.2d 584, 593–95 (D.C. Cir. 1971)).

Undeterred, Sault insists the income issue is a simple matter that the Court should resolve in the first instance. *See* Pl.'s Reply at 67–68. After rightly charging the Secretary with usurping the Tribe's role under § 108(c), Sault now invites this Court to usurp the Secretary's role under § 108(f). This the Court will not do.

In *EDF*, the *agency itself* had made the findings that triggered its statutory duty. *See* 439 F.2d at 594–95. In a later case that distinguished itself from *EDF*, the agency had made, but then recanted, the findings that triggered its duty. *See PCHRG v. FDA*, 740 F.2d 21, 33 (D.C. Cir. 1984). In that circumstance, the court's only basis for ordering the agency to act would have been a "substantive judgment that the early position was correct and the later position erroneous." *Id.* The court demurred, as "[s]uch a judgment would require [it] to evaluate the scientific evidence before the agency and conclude that this evidence mandated a finding that aspirin products are misbranded." *Id.* This was "precisely the genre of question the resolution of which Congress has entrusted to the agency in the first instance." *Id.*

This case is like *PCHRG*, not *EDF*. The lack of any finding on the income issue is analogous to a situation in which an agency makes a finding but then recants it. And this issue requires a factual inquiry that would benefit from the agency's expertise. After all, Sault's evidence consists of specialized documents such as audits, financial statements, and deeds. Pl.'s Mot. at 55; *see* A.R. 2139–47, 3098, 3163, 3165–85. According to one Intervenor, this evidence establishes the *opposite* of what Sault claims. *See* NHBP's Mot. at 27. Sault fails to offer a persuasive reason why the Court should take the unusual step of resolving this factual issue in the first instance. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("The factfinding capacity of the district court is . . . typically unnecessary to judicial review of agency decisionmaking.").

What's the upshot of all this?  The Court will not order the Department to take the Sibley Parcel into trust.  If the Department does have a clear duty to act, the duty is to determine whether Sault acquired the Sibley Parcel with Fund income.  This implicates the Tribe's alternative request for extraordinary relief—an order instructing the Department to resolve the income issue within 90 days.  The Court will not grant this relief either, though, because the Department has not unreasonably delayed a finding on the income issue.

 With claims of unreasonable delay, "[e]ach case must be analyzed according to its own unique circumstances" and "[e]ach case will present its own slightly different set of factors to consider."  *Air Line Pilots Ass'n, Int'l v. CAB*, 750 F.2d 81, 86 (D.C. Cir. 1984).  Thus, no "ironclad" test exists, but the D.C. Circuit often finds guidance in six factors:

> (1) the time agencies take to make decisions must be governed by a rule of reason;
>
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
>
> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
>
> (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
>
> (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and
>
> (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*TRAC v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (cleaned up).

Sault submitted its trust application in June 2014, and the Department issued its final decision in July 2017.  A.R. 1930, 3110.  The agency thus took about three years to issue a decision that did not address the income issue.  But MILCSA does not provide a "timetable or

other indication of the speed with which it expects the agency to proceed." *TRAC*, 750 F.2d at 80.  More, the Court must consider the three years in context.  The Department never resolved the income issue in that timespan because it thought this unnecessary.  *See* A.R. 974, 1932 n.15.  On its reading of the statute, Sault's failure to show compliance with § 108(c) was enough to deny the trust application.

The Court is mindful that the Department's reading of MILCSA contradicts its unambiguous meaning.  *See supra* Section IV.  That makes the agency's reading "unreasonable" in a certain sense.  *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 n.4 (2009) ("[I]f Congress has directly spoken to an issue then any agency interpretation contradicting what Congress has said would be unreasonable.").  But this is not dispositive.  None of the six factors from *TRAC* suggests that delay is automatically unreasonable under § 706(1) if it results from the agency's mistaken interpretation of a statute.  The Department's reading was far from frivolous and adhered to its own precedent (the Bay Mills Opinion).  Its ultimate action was internally consistent—there was no need to decide the income issue since it perceived an independent basis to deny the trust application.  The delay on the income issue thus does not reflect a "breakdown of regulatory processes."  *Cutler v. Hayes*, 818 F.2d 879, 897 n.156 (D.C. Cir. 1987).

Three years was not an unreasonable amount of time for the Department to decide the issues it did.  The record before the agency consisted of hundreds of pages.  It engaged in a back-and-forth with Sault about whether acquisition of the Sibley Parcel would increase the value of tribal lands.  There is no suggestion that the agency acted in bad faith during this process.  It also understandably accepted input from two other Michigan tribes—the NHBP and the Saginaw Tribe.  A.R. 64, 180.  The three-year span is not comparable to the six-year and nine-year delays in the cases that Sault cites.  *See In re Core Commc'ns, Inc.*, 531 F.3d 849, 856 (D.C. Cir. 2008)

(six-year delay in responding to the D.C. Circuit's remand); *In re Bluewater Network*, 234 F.3d 1305, 1316 (D.C. Cir. 2000) (nine-year delay).

Sault focuses on *TRAC*'s third factor about the consequences of agency delay. *See Cutler*, 818 F.2d at 898 ([P]erhaps most critically, the court must examine the consequences of the agency's delay."). "[D]elays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake." *TRAC*, 750 F.2d at 80. Sault maintains that the human consequences of delay have been "significant." Pl.'s Reply at 68. Specifically, the delay has deprived the Tribe "of the opportunity to provide crucial employment and fund essential government services for the approximately 14,500 tribal members living in the Lower Peninsula." *Id.*

The Court appreciates these concerns, but they do not strike the Court as so dire to warrant extraordinary relief. Indeed, Sault's urgent tone is difficult to reconcile with its filing of this action more than a year after the Department gave its final decision. If the income issue is as straightforward as Sault claims, there is no reason to suspect that the agency would drag its feet. This is a situation in which the agency mistakenly thought it was unnecessary to decide the relevant issue. Any additional delay will be at its own peril. But the Court will not order the Department to decide the income issue within 90 days of remand.

## VI.

For all these reasons, the Court will grant in part and deny in part the five motions for summary judgment. The Court will vacate the Department's decision and remand to the agency for further proceedings consistent with this opinion. An appropriate Order will issue.

Dated: March 5, 2020            TREVOR N. McFADDEN, U.S.D.J.