**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

**SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS**,

               Plaintiff,

               v.

**DEBRA A. HAALAND, in her official capacity as United States Secretary of the Interior,** *et al.*,

               Defendants,

               and

**SAGINAW CHIPPEWA INDIAN TRIBE OF MICHIGAN,** *et al.*,

               Defendant-Intervenors.

</td><td>

Case No. 1:18-cv-02035 (TNM)

</td></tr>
</table>

**MEMORANDUM OPINION**

      This case marks the latest chapter in the Sault Ste. Marie Tribe of Chippewa Indians' ("the Sault" or "the Tribe") efforts to compel the Secretary of the Interior to take land into trust for a casino.  Interior refused to do so because the Sault had not satisfied the terms of a land settlement statute, which requires purchases to be for "social welfare" or the "enhancement of tribal lands."

      The Sault contends that Interior's refusal was contrary to law and arbitrary or capricious under the Administrative Procedure Act.  For relief, the Tribe seeks vacatur of the decision and either an order compelling Interior to take the land into trust or one directing it to issue a new decision.  The Tribe pressed—and lost on—its two primary arguments in the D.C. Circuit.  It

now moves for summary judgment on three other grounds.  Interior and Intervenors—three commercial casinos ("the Casinos"), the Nottawaseppi Huron Band of the Potawatomi, and the Saginaw Chippewa Indian Tribe of Michigan (collectively, the "Michigan Tribes")—cross-move for summary judgment.

The Court holds that Interior's refusal to take the land into trust was neither contrary to law nor arbitrary.  Interior's decision respects the natural, ordinary meaning of the land settlement statute.  And Interior both engaged in reasoned decision-making and adequately explained the basis for its refusal.  The Court will thus grant Interior and Defendant-Intervenors summary judgment.

## I.

### A.

The Sault is a federally recognized tribe with more than 40,000 enrolled members.  AR3113.[1]  In the nineteenth century, the Sault's ancestors sold much of their land to the Federal Government for pennies on the dollar.  *See* Treaty of March 28, 1836 (7 Stat. 491); 26 Ind. Cl. Comm. 550, 553 (Dec. 29, 1971) (Docket Nos. 18-E and 58).  A congressional commission found the sale unconscionable and awarded the Sault and other tribes more than $10 million in damages.  *See* Ind. Cl. Comm. at 561.  Congress then passed the Michigan Indian Land Claims Settlement Act ("Michigan Act" or "Act") to distribute those funds.  *See* Pub. L. No. 105-143, 111 Stat. 2652 (1997).

Section 108 of the Act directs the Secretary of the Interior to transfer the Sault's monetary share into a "Self-Sufficiency Fund."  *Id.* § 108(a)(1)(A), (e)(1).  The Fund contains

---

[1]  Some pages of the administrative record, as they appear in the Joint Appendix, have multiple "AR" page numbers in their bottom right-hand corner.  For consistency, the Court will use the page number with the largest font size.

principal and may also generate income through investment or interest.  *See id.* § 108(b)(1), (c).

The Act delineates different uses for Fund principal and Fund investment income and interest.

The "principal" of the Fund

> shall be used exclusively for investments or expenditures which the board of directors determines . . . (A) are reasonably related to . . . economic development . . . development of tribal resources . . . (B) are otherwise financially beneficial to the tribe and its members . . . or (C) will consolidate or enhance tribal landholdings.

*Id.* § 108(b)(1).  The "interest and other investment income"[2] of the Fund, meanwhile,

> shall be distributed . . . (1) as an addition to the principal of the Fund . . . (2) as a dividend to tribal members . . . (3) as a per capita payment to some group or category of tribal members designated by the board of directors . . . (4) for educational, social welfare, health, cultural, or charitable purposes which benefit the members of the [Tribe] . . . or (5) for consolidation or enhancement of tribal lands.

*Id.* § 108(c).  This case turns on the interpretations of uses four and five for Fund income.

Whether land is purchased with Fund principal or income matters.  According to the

Michigan Act, land acquired using Fund *income* "shall be held in trust by the Secretary for the

benefit of the tribe."  *Id.* § 108(f).  And the Sault can build a casino on the land only if the parcel

is held in trust, because trust status helps the Tribe qualify for an exception to the federal law

governing gaming.  *See Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 25 F.4th 12, 18

& n.3 (D.C. Cir. 2022).

## B.

Today, the Sault describes itself as "economically distressed and land-starved."  Pl.'s

Renewed Mot. for Summ. J. ("Sault MSJ") at 3, ECF No. 9.  Its current trust lands—on which it

operates casinos—are all in Michigan's upper peninsula.  AR2154.  But revenue from these

---

[2]  For clarity, the Court refers to purchases under this section as made with Fund "income," whether or not that income is interest or generated by investment.

casinos has declined.  *See* Sault MSJ at 3.  And about 14,000 of the Tribe's members live in the lower peninsula—far from existing trust lands.  *See id.*  Thus, the Tribe explains that its current landholdings are "woefully inadequate to meet the needs of" its members.  *Id.*

To improve its situation, the Tribe's board voted to use Fund income to purchase a 71-acre plot in the Lower Peninsula—the "Sibley Parcel."  *See, e.g.*, AR3149.  Recall that if the Sault purchases land with Fund income (rather than principal), Interior "shall" hold such land "in trust . . . for the benefit of the tribe."  Pub. L. No. 105-143, § 108(f).  And that would give the Tribe a chance to open a casino, *see Sault Ste. Marie*, 25 F.4th at 18 & n.3—the Sault's plan from the start, AR3112 n.1.  So the Sault filed an application in June 2014 asking Interior to take the parcel into trust.  AR3110–64.

Over the next two and a half years, Interior periodically asked for more information.  *See, e.g.*, AR2242–43 (October 2014 letter).  For example, Interior contacted the Sault four months after receiving its application.  *See id.*  Interior informed the Tribe that it defines "enhancement" in § 108(c)(5)'s "enhancement of tribal lands" as "to make greater, as in cost, value, attractiveness, etc.; heighten, intensify, augment."  AR2243 (quoting Webster's New Twentieth Century Unabridged Dictionary).  And Interior told the Sault it needed more proof that its planned acquisition meets this definition.  *See id.*  Following that letter, the Tribe supplemented the record.  *See* AR2148–228.

Eventually, Interior sent the Sault an interim decision in January 2017 explaining that the Tribe had provided "insufficient evidence" to warrant taking the land into trust.  AR969–74 ("January Letter").  Interior explained that its procedures "require evidence" that the parcel "meet[s] the requirements for mandatory acquisition."  AR969.  To explain its "procedures," Interior referred the Tribe to a guidance document.  *See id.* n.3.  That document explains that

even if a statute such as the Michigan Act imposes a mandatory trust duty, the agency "will determine whether the parcel meets any additional required criteria . . . [and] will ensure that those criteria are met" before it takes land into trust.[3]   And Interior again asked the Tribe for more evidence.   AR974.

Recall that the Michigan Act specifies these criteria.   The Act instructs that Fund income "shall be distributed . . . for educational, social welfare, health, cultural, or charitable purposes" or for the "enhancement of tribal lands."   Pub. L. No. 105-143, § 108(c)(4–5).   According to Interior, the Sault had failed to show that its plans for the Sibley parcel satisfied either end.

*First*, Interior explained that the Sault failed to show its purchase was for "educational, social welfare, health, cultural, or charitable purposes" under § 108(c)(4).   AR971–72 n.25.   The Tribe pledged to build a casino on the land and devote five percent of its income "to address the unmet social welfare, health and cultural needs" of tribe members living nearby.   AR2160. Three percent would benefit tribal elders and two percent would create a college scholarship program.   AR3150.   But Interior found these proposals "too attenuated" to satisfy the Michigan Act.   AR972 n.25.   "Should the Tribe purchase land with Self-Sufficiency Fund income for a school, a job training center, a health clinic, or a museum," Interior explained, "such purpose may fall within the scope of Section 108(c)(4)."   *Id.*   But as things stood, the Tribe could not satisfy the Michigan Act's requirements by using Fund income "to start an economic enterprise, which may generate its own profits, which . . . might then be spent on social welfare purposes."

---

[3] *Updated Guidance on Processing of Mandatory Trust Acquisitions*, Mem. from Larry Echo Hawk, Assistant Secretary-Indian Affairs, to Regional Directors and Superintendents, U.S. Dep't of Interior, (Apr. 6, 2012), accessible at https://www.doi.gov/sites/doi.gov/files/october-2019-qfrs_0.pdf [Updated Guidance].

*Id.*  In other words, Interior found that the Sault's proposed use of the land fell outside the plain text of § 108(c)(4).  *See id.*

Second, Interior informed the Tribe that it lacked sufficient evidence to conclude that the Sibley parcel constitutes an "enhancement of tribal lands" under § 108(c)(5).  After Interior asked for more "enhancement" evidence in the October 2014 letter, AR2242–43, the Tribe submitted more information in response, AR2148–228.  Relevant here, the Sault submitted two affidavits—one from the Tribe's Chief Financial Officer of Casinos ("the CFO") and the other from the Director of the Tribal Housing Authority ("the Director")—that it claims prove enhancement.  AR2156, AR2213–15, AR2227–28.  The CFO swore that the Sibley parcel "will allow the operation of casinos that, in turn, will enable the Tribe to improve its existing facilities on tribal lands in the Upper Peninsula."  AR2215.  And the Director explained that gaming revenue is the most viable means of providing housing to tribal members, which is currently scarce.  *See* AR2227–28.

Unconvinced, Interior explained that the Tribe had again failed to "make a sufficient showing" of how the parcel would enhance its existing lands in Michigan's upper peninsula.  AR973.  And Interior rejected the Sault's claim that the purchase would enhance nearby lower peninsula land by "creating a critical mass of tribal lands" allowing for economic development and the delivery of services.  *Id.*  Interior again reminded the Tribe that before taking land into trust, "we need more; we need evidence," but so far the Tribe had "provide[d] no evidence" to satisfy § 108(c)(5).  So Interior kept Sault's application open for further supplementation.  AR974.

A few months later, the Tribe and its counsel met with Interior officials.  AR1889.  The Sault asked about the "standards that the Department will use and the type of evidence it would

require" to decide whether to take the land into trust.  *Id.*  Nothing in the administrative record details how Interior responded to the Tribe's query.  But during this meeting, the Tribe's lawyer "acknowledged they did not believe the Tribe could provide . . . [any additional] evidence" on the enhancement issue.  AR1930 n.4.  Interior then denied the Sault's trust application for the Lansing Parcel in July 2017.  AR1930–33 (July Letter).

The July Letter largely reiterated Interior's earlier conclusions.  *See id.*  It incorporated the agency's finding in the January Letter that "expenditures of potential gaming revenue are too uncertain and attenuated" to meet the Michigan Act's requirement that Fund income be used for "social welfare purposes."  AR1931 n.9 (citing AR972 n.25).  As for the enhancement issue, Interior explained that the Sault has "not offered real estate appraisals or assessments . . . suggesting that the value of one tract of land would increase as a result of the acquisition of another."  AR1932.  Instead, the Tribe merely supplied "attenuated reasoning" that economic development might be possible on the parcel, which might generate revenue, which might then be used to enhance existing tribal lands.  AR1933.  Even if Interior could accept this multi-step causal chain, it nonetheless reasoned that the Sault "has not offered any evidence of its plans to use the gaming revenue to benefit its existing lands or its members."  *Id.*  Interior rejected the Tribe's "conclusory statements" on this point—presumably those found in the Tribe's affidavits. *Id.* & n.9 (citing case explaining that lawyers' arguments and statements are not evidence).

The Sault sued.  It sought vacatur of the July Letter and an order compelling Interior to take the Sibley parcel into trust.  Compl. ¶ 101(a), (e).  This Court initially ruled for the Tribe on its threshold argument that the Secretary lacked authority to decide whether the Tribe's use of Fund income complied with the Michigan Act.  *See Sault Ste. Marie Tribe of Chippewa Indians v. Berhardt*, 442 F. Supp. 3d 53 (D.D.C. 2020).  But the D.C. Circuit disagreed.  *See Sault Ste.*

*Marie*, 25 F.4th 12.  That leaves the Tribe's fall back arguments for summary judgment, *see* Sault MSJ, and cross-motions from Interior, the Casinos, and the Michigan Tribes, *see* Mem. in Support of Federal Defs.' Renewed Mot. for Summ. J. (Interior MSJ) at 12, ECF No. 95-1; Intervenor-Defs.' Detroit Casinos' Opp'n and Cross-Mot. for Summ. J. (Casinos' MSJ) at 2, ECF No. 94; Michigan Tribes' Opp'n and Cross-Mot. for Summ. J. (Michigan Tribes' MSJ) at 7, ECF No. 97.[4]

## II.

Summary judgment is normally appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  But this standard does not apply when a court is reviewing a decision by an administrative agency under the APA.  *See, e.g.*, *Remmie v. Mabus*, 898 F. Supp. 2d 108, 115 (D.D.C. 2012).  Instead, this Court "determine[s] whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).  In other words, "the district judge sits as an appellate tribunal" and the "entire case on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (cleaned up).  Under the APA, courts must "hold unlawful and set aside" a decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

---

[4]  Sault has requested oral argument on the pending motions.  *See* Pl.'s Opp'n to Defs.' and Intervenors' Renewed Cross-Mots. for Summ. J. at 1, ECF No. 100.  Because the Court finds the parties' motions sufficient and previously heard arguments on the parties' initial briefs, it declines this request.  *See* LCvR 7(f).

### III.

The Sault says Interior's decision should be vacated for several reasons.  First, the Tribe argues that Interior misinterpreted the Michigan Act.  Second, it claims that Interior acted arbitrarily and capriciously by disregarding record evidence for the Act's "social welfare" and "enhancement of tribal lands" requirements.  Third, the Tribe suggests that Interior failed to adequately explain why it rejected the Tribe's application.  The Court addresses each in turn.

### A.

Interior's refusal to take the land into trust was not contrary to law.  Recall that the Sault justified its use of Fund income by arguing that economic development on the parcel—a casino—would generate revenue, five percent of which would finance scholarships and services for tribal elders.  AR3119; AR3150.  The Tribe also argued that its purchase would "provide a land base" to facilitate delivery of social services and create jobs.  AR3119.  Interior found these arguments "legally insufficient" to meet § 108(c)(4)'s requirement that income be used "for . . . social welfare . . . purposes" because they were "too attenuated."  AR971–72 n.25.  Interior explained that "a school, a job training center, a health clinic, or a museum" may qualify.  *Id.*  But it noted that the Sault cannot satisfy § 108(c)(4) by merely "start[ing] an economic enterprise, which may generate its own profits, which . . . might then be spent on social welfare purposes."  *Id.*; *see also* AR1931 & n.9.

Because the Sault challenges Interior's interpretation of the Michigan Act, this Court "first consider[s] whether Congress has directly spoken to the precise question at issue by looking to the statutory text."  *Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 92 (D.C. Cir. 2020) (cleaned up).  Because the terms in § 108(c)(4) are not defined, this Court gives them their "ordinary, contemporary, common meaning, as informed by the context of the overall statutory

scheme." *Sault Ste. Marie*, 25 F.4th at 21.  If the statute is clear, the Court's inquiry ends.  *See id.*

## 1.

The Michigan Act permits Fund income to be used "for educational, social welfare, health, cultural, or charitable purposes which benefit the members of the Sault Ste. Marie Tribe." Pub. L. No. 105-143, § 108(c)(4).  So does the Sault's plan to use income to purchase land to build a casino and devote a sliver of its income to social welfare qualify?

The Sault first argues that "social welfare" is a broad phrase meriting expansive application.  *See* Sault MSJ at 10.  The Tribe points to the Oxford English Dictionary (OED) Third Edition, which defines social welfare as "the well-being of a community . . . esp. with regard to health and economic matters."  *Id.*  And the Sault claims that "charitable purposes" include relief of poverty, promotion of health, and governmental or municipal purposes.  *Id.* (citing Restatement (Second) of Trusts § 368 (1959)).

The Court does not read "social welfare" so expansively.  First, most other dictionaries define social welfare more narrowly without reference to "economic matters."[5]  For example, Merriam Webster's Collegiate Dictionary defines "social welfare" as "organized public or private social services for the assistance of disadvantaged groups."  *Social Welfare*, Merriam Webster's Collegiate Dictionary (10th ed. 1997).  And the Cambridge Dictionary defines the phrase as "services provided by the government or private organizations to help poor, sick, or old

---

[5]  The Court looks to dictionaries from around the time of the Act's enactment to today because few dictionaries in the years right before and after its enactment define the phrase "social welfare."

people."[6]  Similarly, the Black's Law Dictionary entry cross-references "social service," defined as "a service that helps society work better; esp. organized philanthropic assistance for those most in need."  *Social Welfare*, Black's Law Dictionary (11th ed. 2019).  These definitions are narrower than the one the Sault offers and suggest direct, nonprofit charitable activities.

Second, the words listed around "social welfare" inform its meaning:  "educational," "health," "cultural," and "charitable."  The canon *noscitur a sociis*—that words are known by the company they keep—holds that "words grouped in a list should be given related meanings." Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012) (Scalia & Garner); *see also United States v. Williams*, 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated.").  This canon serves to "limit a general term to a subset of all the things or actions that it covers."  Scalia & Garner at 196.  So, even if "social welfare" standing alone can be broadly construed, the nearby words in § 108(c)(4) cabin it.

Consider "educational."  It means "of or relating to the provision of education," and "education" is defined as the "systematic instruction, teaching, or training in various academic and non-academic subjects."[7]  And "health" is "the condition of being sound in body, mind, or spirit," especially "freedom from physical disease or pain."[8]  Next, "cultural" is defined as

---

[6]  *Social Welfare*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/social-welfare.

[7]  *Educational*, Oxford English Dictionary (3d ed. 2022), https://www.oed.com/view/Entry/59586?redirectedFrom=educational#eid; *Education*, Oxford English Dictionary (3d ed. 2022), https://www.oed.com/view/Entry/59584#eid5743856. *See also, e.g.*, *Education*, Merriam Webster's Collegiate Dictionary (10th ed. 1997) ("[T]he knowledge and development resulting from an educational process.").

[8]  *Health*, Merriam Webster's Collegiate Dictionary (10th ed. 1997); *see also, e.g.*, *Health*, Oxford English Dictionary (3d ed. 2022),

"relating to intellectual and artistic pursuits."[9]  Finally, "charitable" is defined as "liberal in benefactions to the needy."[10]

Contra the Tribe's OED definition, none of these words suggest a for-profit venture, let alone a casino.  Indeed, these dictionary definitions underscore the obvious.  Suppose an ordinary English speaker new to a town asks a local friend for some Saturday-afternoon educational, healthful, cultural, or charitable activities.  It would be entirely natural for the friend to suggest visiting a local museum, enjoying a walk in a nature preserve, or volunteering at a local soup kitchen.  Only in an alternate America would the friend recommend spinning the roulette wheel or throwing the craps dice.

At bottom, the Sault's argument is that "social welfare" should be read to sweep in anything that benefits a community—including economic development.  *See, e.g.*, Sault MSJ at 9–10.  But if that is really what "social welfare" means, "educational," "health," "cultural," and "charitable" become superfluous.  *Cf. Yates v. United States*, 574 U.S. 528, 551 (2015) (Alito, J., concurring) (explaining when applying *noscitur a sociis* that reading a word in a list of associated words too broadly could render others in the list superfluous).  Because it is this Court's "duty to give effect, if possible, to every clause and word of a statute," it is "reluctant to treat statutory terms as surplusage."  *Duncan v. Walker*, 553 U.S. 167, 174 (2001) (cleaned up).

---

https://www.oed.com/view/Entry/85020?rskey=pE5xjw&result=1&isAdvanced=false#eid ("soundness of body" or "[t]he general condition of the body with respect to the efficient or inefficient discharge of functions").

[9] *Cultural*, Oxford English Dictionary (3d ed. 2008), https://www.oed.com/view/Entry/45742?redirectedFrom=cultural#eid.

[10] *Charitable*, Merriam Webster's Collegiate Dictionary (10th ed. 1997).

Construed in context, the plain meaning of "social welfare" does not encompass a for-profit casino.

### 2.

Not so fast says the Tribe. Even if Interior is right about the meaning of social welfare, it is wrong that the Tribe's plan to further it is too attenuated. In other words, Fund income need not "immediately result in a specific social welfare (or other benefit)" because "[e]xpenditures do not themselves directly provide the types of benefits listed in § 108(c)(4)." Sault MSJ at 9, 11. The Sault uses the purchase of land to build a health clinic as an example, arguing that only the eventual operation of the clinic achieves one of § 108(c)(4)'s purposes. *See id.* at 11. This pivot allows the Sault to argue that Fund income "need only have the object of attaining, or be a means of facilitating" one of § 108(c)(4)'s purposes. It need not achieve those purposes directly.

To support that reading, the Sault dismembers the text and stitches it back together to broaden its meaning. First, the Tribe separates the words "for" and "purpose." Sault MSJ at 10–11.[11] It says that "for" means "with the object or purpose of," *id.* (citing *Jennings v. Rodriguez*, 138 S. Ct. 830, 845 (2018)), and "purpose" is "an objective, goal, or end," *id.* (citing Black's Law Dictionary 1250 (7th ed 1999)). Then, it combines those two definitions. *See id.* This textual sleight of hand allows the Sault to conclude that fund income may be spent on anything so long as money eventually trickles down to one of § 108(c)(4)'s enumerated ends. *See* Sault MSJ at 10–11.

That is a tortured reading of the statute. "Adhering to the *fair meaning* of the text (the textualist's touchstone) does not limit one to the hyperliteral meaning of each word in the text."

---

[11] Casino Intervenors do the same. *See* Casinos' MSJ at 2–4. They define "for" as "indicat[ing] purpose" which largely maps onto Sault's definitions of "for" and "purpose." For the reasons explained, the Court does not find that granular definition of terms particularly helpful.

Scalia & Garner at 356.  Indeed, "courts must adhere to the ordinary meaning of phrases, not just the meaning of the words in a phrase." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1825 (2020) (Kavanaugh, J., dissenting).  "If the usual evidence indicates that a statutory phrase bears an ordinary meaning different from the literal strung-together definitions of the individual words in the phrase, we may not ignore or gloss over that discrepancy.  Legislation cannot sensibly be interpreted by stringing together dictionary synonyms of each word." *Id.* (cleaned up).

With these principles in mind, the Court declines to construe "for" and "purpose"—two extremely broad terms—in isolation.  Instead, the Court interprets the phrases "for . . . social welfare . . . purposes" and "social welfare" in context.  *See supra* Part III.A.1.  Doing so reveals that Congress required Fund income to "be distributed . . . for . . . social welfare . . . purposes"— full stop.  And social welfare has a narrower definition that excludes economic development projects such as a casino.  *See id.*  Contra the Tribe's reading, the Act does not permit Fund income "to be spent to generate revenue to be used" for one of § 108(c)(4)'s enumerated ends.  Interior MSJ at 13–14 (cleaned up).  Reading "for" and "purpose" as the Sault requests could sweep just about any purchase into § 108(c)(4)'s ambit so long as a cent it generates eventually furthers education, health, culture, or charity.  The statute's text does not permit that result.

While the Sault contends that Interior is reading a directness or immediacy restriction into the statute, *see* Sault MSJ at 12–13; Sault Reply at 3, that argument also fails.  The Tribe's argument turns on the fact that Congress could have included "direct" or "immediate" before the enumerated ends.  But this Court is wary of drawing inferences from what Congress did not do. *Cf. United States v. Craft*, 535 U.S. 274, 287 (2002) (explaining that "several equally tenable inferences may be drawn from [Congressional] inaction, including the inference that the existing legislation already incorporate[s]" a meaning).  Congress's "choice of words is presumed to be

deliberate," and this Court's interpretation is faithful to the precise wording. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013).[12]

The Sault also argues that the Supreme Court has interpreted a similar phrase—"for the purpose of" broadly. Sault MSJ at 10. In *Mortenson v. United States*, the Court interpreted "for the purpose of prostitution and debauchery" in a criminal statute prohibiting human trafficking. 322 U.S. 369, 373–74 (1944). The Court found it "essential that interstate transportation have for its object or be the means of effecting or facilitating the proscribed activities"—namely, prostitution and debauchery. *Id.* at 374. The Sault thus argues that "'for the purpose of' means that an action must 'have for its object or be the means of . . . facilitating' an end result." Sault MSJ at 10 (quoting *Mortenson*, 322 U.S. at 374).

But as Interior recognizes, *Mortenson* provides little support for a capacious interpretation of "for . . . social welfare . . . purposes" in the Michigan Act. *See* Interior MSJ at 14 n.3. *Cf. United States v. Torres*, 894 F.3d 305, 315–16 (D.C. Cir. 2018) (declining to apply *Mortenson*'s reasoning about "for the purpose of" to a statute criminalizing child pornography that "calls for a different approach"). And *Mortenson*'s reasoning is especially inapposite given the D.C. Circuit's narrowing construction of § 108(c)(4), as the Court now explains.[13]

---

[12] While Sault argues that no Defendant supplies an "administrable or coherent" standard for applying Interior's interpretation, Sault Reply at 10, that is beside the point. This Court is bound to interpret the enacted text; it is the province of Congress to address any practical concerns that may arise.

[13] In its Reply, Sault cites other cases in which "for the purpose of" is read to encompass conduct that seeks to achieve some ultimate end, despite how immediately or likely it is to be achieved. *See* Sault Reply at 5–6. First, the Court is loath to import language from other statutes when the text and structure of this one is clear and the D.C. Circuit has interpreted it. *See infra* Part III.A.3 (discussing *Sault Ste. Marie*, 25 F.4th at 17–18). Second, Sault overstates the persuasiveness of these cases. Their contexts are inapt (for example, the conversion of wetlands) and only one is from the Supreme Court. *See* Sault Reply at 5 (quoting *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 501, 505 (1993)). The Court rejects Casino Intervenors' invocation of the

**3.**

Circuit precedent hammers the final nail in the coffin.  As Interior and Intervenors highlight, the D.C. Circuit reasoned that § 108(c)(4) must be harmonized with its neighbor § 108(b), the provision that governs the use of Fund principal.  *See* Interior MSJ at 12; Casinos' MSJ at 2; Michigan Tribes' MSJ at 7.  Recall that § 108(b) permits Fund principal to be used for "investments or expenditures" reasonably related to "economic development" or that "are otherwise financially beneficial to the tribe and its members." *Id.* § 108(b).  Section 108(c)(4), on the other hand, "restricts the expenditure of Fund [income] to five uses . . . which necessarily excludes other uses." *Sault Ste. Marie*, 25 F.4th at 17–18; *accord* Scalia & Garner at 107–11 (explaining that under the negative-implication canon "specification of the one implies exclusion of the other").  Key here, Congress included an important use in § 108(b) that it omitted from § 108(c)(4):  economic development.

Problematically for the Sault, it has consistently called its acquisition of the parcel an economic development project. *See, e.g.*, AR2215; AR1888; AR3093; AR3149; *see also* Interior MSJ at 11–12 (highlighting this fact); Michigan Tribes' MSJ at 8 (same).  Even the Tribe's Complaint states, "[i]n an attempt to improve its dire financial position, the Sault Tribe settled on an economic development plan to open a casino in the Lower Peninsula." Compl. ¶ 35; *see also id.* ¶ 3 (explaining that it asked Interior to take the parcel into trust "thereby paving the way for potential gaming and other economic development on the land").

So its acquisition fits most naturally under § 108(b), which would require the expenditure of Fund principal and does not trigger Interior's duty to take the land into trust.  The Tribe's

---

Racketeer Influenced and Corrupt Organizations Act's language, *see* Casinos' MSJ at 4–5, for similar reasons.

argument that building a casino falls under "social welfare" because pennies on the revenue dollar may ultimately be spent for education or tribal elders is untenable.  That reading upsets the statute's careful distinction between Fund principal and income.  *Cf. Sault Ste. Marie*, 25 F.4th at 17–18.  "When Congress includes particular language in one section of a statute but omits it in another section of the same Act, we generally take the choice to be deliberate."  *Badgerow v. Walters*, 142 S. Ct. 1310, 1318 (2022) (cleaned up).  Thus, "[g]iven [§ 108(c)(4)'s] clear language, it would be improper to conclude that what Congress omitted from [it] is nevertheless within its scope."  *Nassar*, 570 U.S. at 353.  The Sault cannot shoehorn its economic development project into § 108(c)(4)'s text when it is covered by a neighboring subsection.[14]

The Sault argues in its Reply that §§ 108(b) and (c)(4) are not distinct because Fund income may be distributed "as an addition to the principal of the Fund."  Pub. L. No. 105-143, 108(c)(1); Sault Reply at 14.  While it is correct that these provisions are not hermetically sealed, the Tribe cannot get around Circuit precedent holding that § 108(c) is narrower than § 108(b).  *See Sault Ste. Marie*, 25 F.4th at 17–18.  And to read § 108(c)(4) to include economic development when § 108(b) clearly speaks to it would violate the common statutory-interpretation maxim that what each section includes, neighboring sections exclude.  *Cf. Badgerow*, 143 S. Ct. at 1318.

## 4.

The Sault levies a few other arguments.  None are persuasive.  *First*, the Tribe complains that Interior rejected its § 108(c)(4) arguments in only a footnote and did not conduct textual

---

[14] The Sault retorts that Interior's suggested uses for § 108(c)(4) funds— a museum or a job training program—are also forms of economic development.  *See* Sault Reply at 13.  But this misses the point.  A college remains "educational" even though it may also be profitable.

analysis. *See* Sault MSJ at 9 (citing AR1931 n.9 and AR971–72 n.25).[15] True, Interior does not cite any dictionaries or canons. AR1931 n.9; AR971–72 n.25. But it did provide the Sault an illustrative list of what might qualify for § 108(c)(4): a school, a job training center, a health clinic, or a museum. AR972 n.25. Interior's examples reflect its commonsense view of what counts as a "social welfare" purpose and provide enough explanation to the Tribe. And in any event, this Court focuses on whether the statute answers the question at issue, not the depth or breadth of Interior's textual analysis.

*Second*, the Tribe suggests that because the Michigan Act was a "negotiated compromise" between the Sault and the Government, it should be given its "full and fair meaning." Sault MSJ at 11–12. The Sault also appeals to tribal sovereignty, arguing that if Congress was silent about something, the Court should draw an inference in favor of the Tribe because it is a co-equal sovereign. Sault MSJ at 12. But as Interior notes, Congress and the Sault negotiated the Michigan Act and it is not a blank check. *See* Interior MSJ at 14–15. Nothing about its terms diminishes Tribal self-sufficiency and sovereignty. *See id.* The Court declines to forgo the best reading of the Act's text simply because the Sault claims it is not the result for which it bargained.

*Third*, out of textual options, the Sault appeals to purpose. Arguing that the Michigan Act "is designed to promote self-sufficiency and meet the vast unmet needs of the Tribe," the Sault argues it must be read to further, rather than frustrate, that purpose. Sault MSJ at 12. But "[n]o statute pursues a single policy at all costs, and [this Court] is not free to rewrite this statute (or any other) as if it did." *Bartenwerfer v. Buckley*, 598 U.S. ---, 2023 WL 2144417, at *7 (Feb.

---

[15] If the Sault intends to argue that Interior acted arbitrarily and capriciously for failing to "set forth its reasons" for its decision about § 108(c)(4), *Tourus Recs., Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001); *see also* 5 U.S.C. § 555, the Court addresses that argument in Part III.B.

22, 2023).  Because the text of the law is clear, the Court "need not consider this extra-textual evidence."  *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017).  And in any event, the Circuit has foreclosed this line of argument:  "[T]he Michigan Act reflects a negotiated agreement," and thus courts "must decline to unravel a legislative deal through resort to imputed purposes."  *Sault Ste. Marie*, 25 F.4th at 21.

*Fourth*, and finally, the Sault argues that because there is "an essential nexus between tribal gaming and the provision of tribal services," all casino revenue-generation is really "a vital means of advancing the educational, social, health, and cultural well-being of Indian tribes." Sault MSJ at 14 (cleaned up); *see also* Sault Reply at 7–8 (arguing that Indian gaming is not considered "for-profit" by tribal commissions or under federal law).  Perhaps so.  But the precise question here is narrower:  Can Fund income be used to purchase land for gaming, which may generate money, five percent of which will finance social welfare projects?  While gaming in general may benefit Indian tribes, the answer is still no.[16]

Part of the administrative record that no party mentions further undercuts the Tribe's position.  The Sault's initial resolution to take the land into trust suggests that the project could *reduce* the money spent for the social welfare of its members.  The resolution states:  "[W]hile this project necessarily requires the purchase of lands using [] income from the Self-Sufficiency Fund, steps should be taken to ensure that this expenditure will not *adversely affect* the annual

---

[16]  Casino Intervenors argue it is speculative that the Sault will even be able to open a casino on the parcel under other federal laws, and that thus its promise of funding social welfare projects "may never materialize."  Casinos' MSJ at 8.  They also suggest that § 108(c)(4) might not justify land purchases at all.  *See id.* at 2 n.1.  And the Michigan Tribe Intervenors take this argument one step further, arguing that gaming on the parcel would be illegal under federal law and Sault's compact.  Michigan Tribes' MSJ at 10.  The Court need not weigh in on this debate because it finds that the text of the Act does not permit the Tribe's planned use of Fund income even assuming the casino could be built.

distribution to the Tribe's elders[.]"  AR3149 (emphases added); *see also id.* (directing that before closing on the parcel, the Tribe's CFO must "identify alternative tribal funds that shall be used to supplement the next . . . annual distribution to the tribal elders . . . to avoid *any reduction* in the amount of that distribution that would otherwise result from the acquisition of that parcel") (emphases added).[17]  Thus it appears that the three percent Sault claims it is devoting to tribal elders merely compensates them for losses incurred through purchase of the parcel.

For these reasons, the Court finds that Interior did not act contrary to law.  Because the Court finds § 108(c)(4) of the Michigan Act clear, there is no need to consider whether Interior's interpretation merits deference.  *See, e.g.*, *Baystate Franklin Med. Ctr.*, 950 F.3d at 92.  And there is also no reason to rehash the interplay between *Chevron* deference and the Indian canon. *See generally Sault Ste. Marie*, 25 F.4th at 28–29 (Henderson, J., dissenting).

**B.**

Interior did not act arbitrarily and capriciously in rejecting Sault's arguments that it met § 108(c)(4)'s "social welfare" and § 108(c)(5)'s "enhancement of tribal lands" requirements. The Sault's secondary argument in its renewed motion for summary judgment is that Interior unreasonably disregarded some of its evidence.  *See* Sault MSJ at 15–20.

An agency acts arbitrarily under § 706(2)(A) of the APA when it "refus[es] to consider evidence bearing on the issue before it" or ignores "evidence contradicting its position." *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).  This principle is "deduced from case law applying the substantial evidence test, under which an agency cannot ignore evidence

---

[17]  The Sault raises additional arguments in its Reply about the history of per-capita payments to tribal members.  *See* Sault Reply at 14–16.  But this argument fails for the same reason as its purpose ones.  This Court "has no roving license . . . to disregard clear language simply on the view that . . . Congress 'must have intended' something [different]." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014).

contradicting its position." *Id.*  While the substantial evidence test applies to formal proceedings, *see* 5 U.S.C. § 706(2)(E), and here Interior conducted informal adjudication, "in their application to the requirement of factual support[,] the substantial evidence test and the arbitrary or capricious test are one and the same." *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984).  But the two tests differ in that it is "permissible . . . for common sense and predictive judgments to be attributed to the expertise of an agency in an informal proceeding, even if not explicitly backed by information in the record." *Phoenix Herpetological Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*, 998 F.3d 999, 1006 (D.C. Cir. 2021).

But the scope of review under the arbitrary and capricious standard is "narrow" and a court may not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*, 463 U.S. 29, 43 (1983).  An agency need only "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.*  While courts "may not supply a reasoned basis for the agency's action that the agency itself has not given," *id.*, they will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974).

## 1.

Consider first the Sault's argument that Interior disregarded evidence related to § 108(c)(4)'s "educational, social welfare, health, cultural, or charitable purposes" requirement. Sault MSJ at 15–18.  The key "evidence" the Sault cites are affidavits.  *Id.* at 15–17.  Interior counters that it assessed all the Tribe's evidence (including the supplements it solicited).  *See* Interior MSJ at 17–19.

21

The core of the Sault's argument is that Interior "addressed only the Tribe's explanation based on gaming revenues," ignoring the Tribe's arguments about job-creation or a new land base to provide services.  Sault MSJ at 17.  And the Sault points to Interior's statements in its January and July denial letters that the Tribe provided "no evidence" and no "supporting documentation" to show that Interior must have ignored the affidavits it submitted.  *Id.* at 17–18.

But in assessing whether Interior engaged in reasoned decision-making under § 706(2)(A) of the APA, this Court is not limited to the two denial letters.  *See, e.g.*, *Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*, 857 F.3d 913, 924 (D.C. Cir. 2017) ("An agency action need not stand or fall on the last document in the record; if the record as a whole satisfies the APA's requirements" it suffices).  The whole record shows that Interior carefully assessed the Tribe's submissions.  And Interior reasonably concluded (a) that the expenditure of potential revenue from the parcel did not satisfy § 108(c)(4), and (b) that the Tribe did not prove its land base or employment claims.  *See* Interior MSJ at 17.

Start at the beginning.  In the Sault's original application, the Tribe devoted most of its nine-page analysis to § 108(c)(5)'s "enhancement of tribal lands" requirement.  AR3115–18.  At the very end, the Tribe tacked on that its "acquisition is also independently justified" under § 108(c)(4)'s "social welfare" language because it would create employment opportunities, allow for the provision of tribal services, and generate revenue.  AR3118–19.  In support, it pointed to a resolution from the Tribal Board of Directors noting that five percent of casino revenue would go to social welfare purposes.  AR3150.  And the Sault submitted an affidavit from the Tribe's CFO in support.  AR3163–64.  But that affidavit just says that the Sault made a deposit on the parcel using Fund income.  *Id.*

As Interior notes, *see* Interior MSJ at 18 & n.4, it considered the Sault's initial submission and then asked the Tribe for more details, AR2242. While that request did not mention the Tribe's terse § 108(c)(4) argument, it asked the Sault for more evidence about how the parcel would enhance tribal lands. AR2243. And Interior stated: "More than a declaration from the Tribe's chief financial officer will be needed to support a request for a mandatory trust acquisition." *Id.*

The Sault then submitted a supplemental application. Flouting Interior's warning that "more than a declaration" was needed, the Tribe submitted more affidavits to bolster its social-welfare argument. One from the Tribal Registrar explained the proximity of tribal members to the Sibley parcel. AR2161. Another from the Director explained that the Sault cannot satisfy the housing needs of its members without the purchase. AR2227–28. Yet another—this time from the CFO of Casinos—explains that the land will provide employment opportunities and a land base to facilitate the provision of social services. AR2214. It is these affidavits that the Sault now argues Interior disregarded in finding that Sault's application did not meet the requirements of § 108(c)(4).

After the Sault submitted its supplement, Interior continued to evaluate its application. The agency even allowed the Michigan Tribes to submit formal oppositions. AR180–217. Those tribes argued that the Tribe's proposed use of Fund income does not comply with § 108(c)(4)'s uses. *E.g.*, AR209. The Sault then submitted a reply, arguing that its application complies with the Act. AR448–50.

In the end, Interior rejected the Sault's plan to buy land, build a casino on it, and contribute five percent of that income to social welfare purposes as "too attenuated" to satisfy that statutory text. AR972 n.25; AR1931 n.9. And Interior reasoned that the Tribe merely

"asserts, without providing supporting documentation" that the parcels will create a land base and allow for employment opportunities.  AR1932; *see also id.* (noting that the Tribe failed to "cite any evidence" on these points).[18]  More, Interior explained in a footnote that "[t]he conclusory statements offered by the Tribe are not evidence."  AR1932 n.16 (citing a case explaining that the statements of counsel are not evidence).

Considering the record as a whole—especially the dialogue between the Tribe and Interior—the Court finds that Interior engaged in reasoned decision-making.  Interior neither refused to consider evidence bearing on the issues before it nor ignored contradictory evidence. *Butte County*, 613 F.3d at 194.  Rather, Interior gave the Sault multiple chances to provide relevant evidence—evidence that its acquisition would directly benefit educational, social welfare, health, cultural, or charitable purposes.  But the Tribe never did so.

The Sault therefore mischaracterizes the record when it asserts that Interior "simply pretended [its] evidence did not exist."  Sault MSJ at 17.  On the contrary, there is every indication that Interior "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[.]"  *State Farm*, 463 U.S. at 43.  And the agency's "path may reasonably be discerned."  *Bowman Transp., Inc.*, 419 U.S. at 286.  The Sault repeatedly failed to submit *probative* evidence that it satisfied § 108(c)(4).  *See, e.g.*, Interior MSJ at 19 (noting that the Sault's submissions "were focused on potential *economic revenue*, rather than direct social welfare effects); *see also* Michigan Tribes' MSJ at 15 ("The materials that Sault claims Interior ignored are nothing more than conclusory statements that Sault could provide unspecified

---

[18]  The Sault expresses concerns that Interior refuted its § 108(c)(4) arguments in a section of its letter discussing the "enhancement" language of § 108(c)(5).  But an agency's "decision need not be a model of analytic precision to survive a challenge," *Coburn v. McHugh*, 679 F.3d 924, 934 (D.C. Cir. 2012), and the Court can easily see what Interior was doing here.

'services' on the Sibley Parcel . . . There was nothing for Interior to disregard.").  This Court may not substitute its judgment for that of the agency, *State Farm*, 463 U.S. at 43, and it is satisfied that Interior made a reasoned decision here.

The Sault raises a few counterarguments.  None succeed.  *First*, the Tribe argues that its affidavits count as evidence, and if Interior disagreed, it had a duty to say why.  *See* Sault MSJ at 17.  Not so.  For its decision to be reasoned, Interior need not reference every document that a party submitted.  *Cf. Crooks v. Mabus*, 104 F. Supp. 3d 86, 100 (D.D.C. 2015) ("[I]t is not necessary for the [agency] to cite explicitly and explain away every point raised").  And Interior explained in the July Letter that "[t]he conclusory statements offered by the Tribe are not evidence."  AR1932 n.16 (citing case noting that the statements of counsel are not evidence).  Indeed, it makes sense that Interior would not spend time refuting various documents that it did not consider evidence *at all*—such as conclusory affidavits.  And, in this context, an agency decision to find a piece of evidence credible or not carries much weight.  *See Phoenix Herpetological Soc'y, Inc.*, 998 F.3d at 1006.

*Second*, the Sault claims that if Interior sought evidence "admissible in court proceedings," it "acted under a mistaken view of the law."  Sault MSJ at 17–18.  While it is true that the "rules of evidence do not apply in informal adjudications," it is also true that "an agency may entirely reject, give credit to, or discount the weight of" affidavits as appropriate.  *Phoenix Herpetological Soc'y, Inc.*, 998 F.3d at 1006 n.14; *compare Lacson v. DHS*, 726 F.3d 170, 178 (D.C. Cir. 2013) (holding that an agency could rely on hearsay to support its decision), *with Phoenix Herpetological Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*, No. 17-cv-2584, 2020 WL 3035037, at *8 (D.D.C. 2020) (explaining that the agency "was within its discretion to reject" an

affidavit), *aff'd,* 998 F.3d 999 (D.C. Cir. 2021).  This is the point of allowing the agency to serve as finder of fact—it collects, weighs, and even discards, documents as it sees fit.

*Third*, the Sault claims that Interior "is entitled to rely on representations by parties who were uniquely in a position to know" the facts at issue—its affiants.  Sault MSJ at 18 (cleaned up).  "But that argument comes up snake eyes[.]"  *Michigan v. Bay Mills Indian Cmty*, 572 U.S. 782, 792 (2014).  Interior cites no case—nor can this Court find any—holding that Interior *must* rely on certain affiants' representations, no matter the depth of their knowledge.  The Court declines the Sault's invitation to second-guess how Interior weighed the evidence the Tribe submitted.

For these reasons, Interior did not unreasonably disregard record evidence in deciding that the Sault had not satisfied § 108(c)(4) of the Michigan Act.

## 2.

The Sault similarly claims that Interior disregarded the CFO and Director's affidavits as evidence that it satisfied § 108(c)(5)'s "enhancement of tribal lands" requirement.  Sault MSJ at 18–20.  For many reasons just discussed, the Sault is incorrect.

As noted, Interior put the Tribe on notice in October 2014 that it had to submit more information about how the parcel enhanced existing tribal lands.  AR2243.  The Tribe then submitted more affidavits and reiterated its belief that the parcel enhances tribal lands.  *E.g.*, AR2160, AR2213, AR2227.  For example, the CFO for Casinos stated, in his "opinion," the parcel "will substantially enhance the Tribe's current landholdings" by "allow[ing] the operation of casinos that, in turn, will enable the Tribe to make substantial improvements to its existing facilities[.]"  AR2215.

Eventually, Interior sent the Sault the January Letter.  AR972.  Interior explained that its procedures "require evidence" that the parcel "meet[s] the requirements for mandatory acquisition."  AR969.  To explain its "procedures," Interior referred the Tribe to a guidance document.  *Id.* at n.3.  That document explains that even if a statute such as the Michigan Act imposes a mandatory trust duty, the agency "will determine whether the parcel meets any additional required criteria . . . [and] will ensure that those criteria are met" before it takes land into trust.[19]  Again, Interior explained that the Tribe had presented "no evidence that the acquisitions of the parcels would effect a consolidation or enhancement of tribal lands."  AR974.  Even still, Interior gave the Sault another chance.  *See id.*  The record also reveals that during a meeting between agency officials, the Tribe, and counsel, "the Tribe's legal counsel acknowledged they did not believe the Tribe could provide such evidence."  AR1930 n.4.

Finally, in the July Letter, Interior detailed why the Sault's submissions were insufficient.  AR1931–33.  For example, the Tribe's submission "did not address the value of the underlying land" and it did not provide "evidence . . . [such as] real estate appraisals or assessments suggesting that the value of one tract of land would increase as a result of the acquisition of another."  AR1932.  And Interior reasoned that the Sault could not prove "enhancement" through a speculative causal chain.  Proof that the parcel allows for economic development, that might make money, which might be used to enhance existing tribal lands, did not count as evidence of enhancement.  AR1933.

---

[19]  Updated Guidance, *supra* note 4.  To be sure, neither this document nor the letter Interior sent to the Tribe in 2014 delineated the precise type of information the agency sought.  *See id.*; AR2242–43.  But Interior put the Sault on notice as early as 2014 that an affidavit from its CEO alone likely would not suffice.  AR2243.

Considering the whole administrative record, the Court finds that Interior drew a rational connection between the facts found and the choice made. *See State Farm*, 463 U.S. at 43. While the Sault accuses Interior of ignoring contradictory evidence and minimizing evidence without adequate explanation, *see* Sault MSJ at 20, the opposite is true. Interior evaluated that evidence and explained repeatedly that it was lacking. More, the agency gave the Tribe a few chances to do better. As the Michigan Tribes note, the Sault's affidavits contain "vague, non-committal statements . . . not plans . . . [so] [t]here was *no* evidence of any specific plans to improve existing tribal lands for Interior to disregard." Michigan Tribes' MSJ at 18. As in its analysis of the § 108(c)(4) arguments, Interior reasonably rejected the affidavits as the sole evidence of an "enhancement of tribal lands." *Cf. Phoenix Herpetological Soc'y, Inc.*, 998 F.3d at 1006.

For these reasons, Interior did not act arbitrarily or capriciously as to the Tribe's § 108(c)(5) arguments.

## C.

At times, the Sault gestures towards a different reason that Interior's rejection of its § 108(c)(4) and (c)(5) arguments was arbitrary and capricious: Interior failed to adequately explain itself. *See* Sault MSJ at 9 (noting that Interior rejected its interpretation of § 108(c)(4) in a footnote); *id.* at 15 (faulting Interior for failing to address certain arguments made by the Tribe); Sault Reply at 22 (arguing that Interior "failed to reasonably explain its rejection" of the Sault's theories); *id.* at 25 (referencing cases holding agency action arbitrary and capricious for failure to adequately explain). The Sault appears to fold these arguments into its claim that

28

Interior failed to engage in reasoned decision-making.  But the APA standard applicable to these types of claims is different.

Agencies are subject to the "fundamental requirement" that they "set forth [] reasons for [a] decision." *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001) (cleaned up). Thus, they must provide "a brief statement of the grounds for denial," unless they are "affirming a prior denial or . . . the denial is self-explanatory." 5 U.S.C. § 555(e).  The key is that the agency explain "why it chose to do what it did." *Tourus Records, Inc.*, 259 F.3d at 737.  In other words, the agency's statement must be one of reasoning, not merely conclusion. *See Butte County*, 613 F.3d at 194.

But the Supreme Court has upheld "curt" agency explanations that "indicated the determinative reason for the final action taken." *Camp v. Pitts*, 411 U.S. 138 (1973).  And the D.C. Circuit has described § 555(e)'s "brief statement" requirement as "minimal," *Butte County*, 613 F.3d at 194, and "modest," *Roelofs v. Sec'y of Air Force*, 628 F.2d 594, 601 (D.C. Cir. 1980).  Indeed, the statements the Circuit has declared insufficient typically comprise a single conclusory sentence, *see, e.g.*, *Butte County*, 613 F.3d at 195, "simply parrot[] the words" of a statute, *Olivares v. TSA*, 819 F.3d 454, 463 (D.C. Cir. 2016), or provide no explanation at all, *see Roelofs*, 628 F.2d at 596.

Interior satisfies § 555(e)'s "minimal procedural requirements." *Butte County*, 613 F.3d at 194.  First, Interior explained in the January Letter that it was rejecting the Tribe's capacious interpretation of § 108(c)(4) as "too attenuated." AR972 n.25.  Interior also listed examples of what might satisfy the provision's requirements.  And it explained that the Sault may not use Fund income to start an economic enterprise, whose profits (if any) may eventually be spent on one of these purposes.  This is not a mere conclusion.  Rather, it explains why Interior cannot

accept the Tribe's application—its proposed use of Fund income does not directly promote social welfare, and a speculative, trickle-down theory does not meet the Act's requirements.

To be sure, Interior dispensed with the Tribe's argument in an extended footnote in the January Letter.  AR971–72 n.25.  And in the final July Letter, Interior merely referred to its prior statement in an even shorter footnote.  AR1931 n.9 ("expenditures of potential gaming revenues are too uncertain and attenuated to satisfy" the Michigan Act's requirements); *see also* AR1931 (citing the January Letter and stating that "[n]one of these findings require further explication or explanation").

If all the Court had were the July Letter, and it did not "affirm[] a prior denial," 5 U.S.C. 555(e), the Sault may have a point.  But the Court considers the whole administrative record, including the January Letter.  *Cf. Tourus Records*, 259 F.3d at 737 (looking beyond a one-sentence final denial letter to the rest of the record).  Viewing the whole administrative record, Interior said enough to satisfy § 555(e)'s "modest" requirements.  That the Interior's succinct explanation of 108(c)(4) conflicts with the Tribe's preferred interpretation does not render it insufficient.[20]

Second, Interior explained its rejection of the Tribe's arguments that the parcel "enhance[d] tribal lands."  Pub. L. No. 105-143, § 108(c)(5).  Interior's reasoned explanations on this point easily satisfy § 555(e)'s requirements.  The agency defined "enhancement" and summarized the Tribe's three arguments before refuting each one.  AR972–73; AR1931–33.  Recall also that Interior told the Tribe in the January Letter that it had not provided sufficient

---

[20]  The Sault faults Interior for "saying nothing" about the Tribe's arguments that the parcel would provide a land base for provision of services to members and employment opportunities.  Sault MSJ at 15.  But § 555(e)'s brief statement requirement does not require that the agency note and address every argument in explaining its denial.  It is clear from the administrative record why Interior rejected the Sault's § 108(c)(4) arguments.  *E.g.*, AR971–72 n.25; AR1931.

evidence of an enhancement to existing tribal lands and permitted supplementation to respond to these deficiencies.  AR972–74.  Then, in the July Letter, the agency again explained that the Sault failed to provide "supporting documentation" for its enhancement arguments and noted that "conclusory statements offered by the Tribe are not evidence."  AR1932.  Interior noted that the Tribe failed to "address the value of the underlying land" and demonstrate how the purchase would increase that value.  *Id.*  The agency thoroughly explained why it rejected the Sault's arguments that it qualified for the "enhancement of tribal lands" language of § 108(c)(5).  Interior decisively clears § 555(e)'s minimal procedural hurdle.

## IV.

For these reasons, the Court will grant Interior and Defendant-Intervenors summary judgment.  A separate Order will issue today.


Dated: March 6, 2023                          _____
                                              TREVOR N. McFADDEN, U.S.D.J.